CA NO. 23-30035

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | D.Ct. # 22-CR-066-LK |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KENDALL ALSTON, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

---

## APPELLANT'S OPENING BRIEF

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

HONORABLE LAURA KING
United States District Judge

MYRA SUN (WA Bar # 14118)
Attorney at Law
1010 N. Central Ave., #100
Glendale, California   91202
Telephone (323) 474-6366
Facsimile (323) 488-6757
Email:   myrasunlaw@gmail.com

Attorney for Defendant-Appellant

CA NO. 23-30035

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | D.Ct. # 22-CR-066-LK |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KENDALL ALSTON, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

---

## APPELLANT'S OPENING BRIEF

---

Appellant Kendall Alston, by and through his attorney of record, submits his Opening Brief for the Court's consideration.

Dated:   August 23, 2023          _____*/s/ Myra Sun*_____
MYRA SUN
Attorney for Appellant

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................3

TABLE OF AUTHORITIES ................................................................5

I.    ISSUES PRESENTED ................................................................11

II.    JURISDICTIONAL STATEMENT .........................................12

    A.   Jurisdiction, Timeliness, and Bail Status ................................12

    B.   Nature of the Case, Course of Proceedings, and Judgment Appealed ....... 12

III.   STATEMENT OF THE CASE ..............................................13

    A.   The indictment ...................................................................13

    B.   Trial evidence on Counts 1-4 ...............................................13

IV.   SUMMARY OF ARGUMENT …………………………………17

V.    ARGUMENT ...........................................................................18

    A.   Mr. Alston adequately objected to the district court's giving the jury no instruction on the meaning of the phrase "in furtherance of," the refusal to do was error, and the error was not harmless. ........................................18

       1.   Standard of review ...................................................18

       2.   Mr. Alston adequately objected to the district court's refusal to include any explanatory language about "in furtherance of," by opposition and by proffering an instruction giving meaning to it. .................................18

    B.   The rejection of Mr. Alston's instruction on the meaning of "in furtherance of" was not harmless error because the jury did not find that he subjectively intended to promote his offense by having the gun where he did. ......................21

    C.   This Court should overrule its decisions in *United States v. Vongxay* and *United States v. Chovan*, based on the Supreme Court's decision in *New York State Rifle & Pistol Assn. v. Bruen*, ___ U.S. ___, 142 S.Ct. 2111, 2127-2128 (2022)..........................................................................25

       1.   Rather than being "presumptively lawful" under *Vongxay* and evaluated for means-end validity under *Chovan*, §922(g)(1), is subject to *Bruen*'s textual-historical test for evaluating Second Amendment challenges to arms regulations, with the burden resting on the government. .................................25

2.    *Vongxay*'s presumption of validity and interest-balancing test for evaluation of arms regulations, as expressly set out in *United States v. Chovan*, is overruled by *Bruen*. ........................................................ 29

E.    Mr. Alston's felon-in-possession convictions in Counts 4 and 5 must be reversed because 18 U.S.C. §922(g)(1) is unconstitutional as applied to him under *Bruen*. ................................................................................ 34

1.    Mr. Alston has good cause for not having raised a Second Amendment challenge to his §922(g)(1) convictions below. .............................. 34

2.    Standard of review .................................................................. 36

3.    Mr. Alston is one of "the people" with a right to arms under the Second Amendment, notwithstanding that his prior convictions are for what were nominally capital offenses in the founding era, and §922(g)(1) directly strips him of his right to arms. ................................................................. 36

4.    The government cannot meet its burden of showing "how" a historical-analogue regulation operated in a "relevantly similar" manner to §922(g)(1), consistent with this country's historical tradition of arms regulation. ............ 40

5.    The government will not be able to demonstrate a historical-analogue regulation, or a historical tradition of arms regulation, equating felon status with dangerousness leading to lifetime disarmament. .................................... 43

VI.    CONCLUSION ............................................................................... 46

CERTIFICATE OF COMPLIANCE .................................................... 47

STATEMENT OF RELATED CASES .................................................. 47

CERTIFICATE OF SERVICE FOR ELECTRONIC FILING ............................. 49

# TABLE OF AUTHORITIES

**Cases**

*Commonwealth of Northern Mariana Islands v. Mendiola*,
 976 F.2d 475, 481 (9th Cir. 1992) ....................................................... 35

*Cottonwood Environmental Law Center v. U.S. Forest Service*,
 789 F.3d 1075 (9th Cir.2015) ............................................................... 30

*Garland v. Atkinson*,
 70 F.4th 1018 (7th Cir. 2023) .............................................................. 33

*Heller v. District of Columbia*,
 554 U.S. 570 (2008) ....................................................................... passim

*In re Stern*,
 345 F.3d 1036 (9th Cir. 2003) ............................................................. 32

*Indiana v. Edwards*,
 554 U.S. 164 (2008) ............................................................................. 31

*Jordan v. Nationstar Mortgage, L.L.C.*,
 781 F.3d 1178 (9th Cir. 2015) ............................................................. 29

*Kanter v. Barr*,
 919 F.3d 437 (7th Cir. 2019) .................................................... 36,37,38

*Kisor v. Wilkie*,
 139 S. Ct. 2400 (2019) ......................................................................... 32

*Lambert v. Saul*,
 980 F.3d 1266 (9th Cir. 2020) ............................................................. 31

*Lewis v. United States*,
 445 U.S. 55 (1980) ............................................................................... 26

*Miller v. Gammie*,
 335 F.3d 889, 893 (9th Cir. 2003) (en banc) ...................................... 30

*Neder v. United States,*
   527 U.S. 1 (1999) ................................................................................21

*New York State Rifle & Pistol Assn. v. Bruen,*
   ___ U.S. ___, 142 S.Ct. 2111 (2022) ..........................................passim

*Old Chief v. United States,*
   519 U.S. 172 (1997) ............................................................................13

*Parker v. District of Columbia,*
   478 F.3d 370 (D.C.Cir. 2007) .............................................................27

*Range v. Attorney General,*
   69 F.4th 95 (3d Cir. 2023) ......................................................34, 35,43

*SEIU v. Los Robles Regional Medical Center,*
   976 F.3d 849 (9th Cir. 2020) ...............................................................30

*Silveira v. Lockyer,*
   312 F.3d 1052 (9th Cir. 2002) .........................................................26,27

*State v. Wentz,*
   68 P.3d 282 (Wash. 2003) ...................................................................46

*United States v. Aguilera-Rios,*
   769 F.3d 626 (9th Cir. 2014). ............................................................34

*United States v. Alaniz,*
   69 F.4th 1124 (9th Cir. 2023) .............................................................29

*United States v. Bullock,*
   2023 WL 4232309, (S.D. Mississippi, June 28, 2023) ......................39

*United States v. Castillo,*
   69 F.4th 648 (9th Cir. 2023) ...............................................................32

*United States v. Chi Mak,*
   683 F.3d 1126 (9th Cir. 2012) ............................................................36

*United States v. Chovan*,
  735 F.3d 1127 (9th Cir. 2013) ................................................................25,28,29

*United States v. Collazo*,
  984 F.3d 1308 (9th Cir. 2021) ...............................................................21

*United States v. Cortes*,
  757 F.3d 850 (9th Cir. 2014) ................................................................18,23

*United States v. Dixon*,
  984 F.3d 814 (9th Cir. 2020) ................................................................31

*United States v. Door*,
  996 F.3d 606 (9th Cir. 2021) ................................................................35

*United States v. Evans-Martinez*,
  611 F.3d 635 (9th Cir. 2010) ................................................................36

*United States v. Everist*,
  368 F.3d 517 (5th Cir. 2004) ................................................................27

*United States v. Ferguson*,
  560 F.3d 1060  (9th Cir. 2009) ................................................................32

*United States v. Guerrero*,
  921 F.3d 895 (9th Cir. 2014) ................................................................34

*United States v. Hector*,
  474 F.3d 1150 (9th Cir. 2007) ................................................................19,22

*United States v. Irons*,
  31 F.4th 702 (9th Cir. 2022) ................................................................19,24

*United States v. Jackson*,
  69 F.4th 495 (8th Cir. 2023) ................................................................43

*United States v. Krouse*,
  370 F.3d 965 (9th Cir. 2004) ................................................................21,22

*United States v. Lopez*,
    100 F.3d 98 (9th Cir. 1996) ............................................................. 18,22

*United States v. Mendoza*,
    11 F.3d 126 (9th Cir. 1993) ................................................................ 21

*United States v. Paixao*,
    885 F.3d 1203 (9th Cir. 2018) ........................................................... 31

*United States v. Plouffe*,
    445 F.3d 1126 (9th Cir. 2006) ........................................................... 32

*United States v. Rahimi*,
    61 F.4th 443 (5th Cir. 2023) .............................................................. 35

*United States v. Thoresen*,
    428 F.2d 654 (9th Cir. 1970) ............................................................. 41

*United States v. Torres*,
    828 F.3d 1113 (9th Cir. 2016) ........................................................... 36

*United States v. Vongxay*,
    594 F.3d 1111 (9th Cir. 2010) ........................................................ 25,26

*United States v. Wenner*,
    351 F.3d 959 (9th Cir. 2003) ............................................................. 46

*United States v. Younger*,
    398 F.3d 1179 (9th Cir. 2005) ........................................................... 26

*Young v. Hawaii*,
    45 F.4th 1087 (9th Cir. 2022) ........................................................... 35

*Young v. Hawaii*,
    915 F.3d 681 (en banc) ..................................................................... 34

**Statutes**

18 U.S.C. § 666 ................................................................................... 31

18 U.S.C. §922(g)(1) ...................................................................passim

18 U.S.C. §3231 ................................................................................ 12

18 U.S.C. §924(c) ....................................................................... 11, 12

18 U.S.C. § 3553 ............................................................................... 32

21 U.S.C. §841 .................................................................................. 12

28 U.S.C. §1291 ................................................................................ 12

An Act to Strengthen the Federal Firearms Act,
    75 Stat. 757 (Oct. 3, 1961) ......................................................... 40

Federal Firearms Act,
    52 Stat. 1251 (June 30, 1938) ..................................................... 40

Fed. R. Crim. Proc. 12 ...................................................................... 34

Manual of Model Criminal Jury Instructions, Instruction No. 14.23 ..................... 19

U.S.S.G. §4B1.2(a)(2) ...................................................................... 46

**Other Authorities**

107 Cong. Rec. H20248
    (daily ed. Sept. 19, 1961) ........................................................... 41

Saul Cornell, A New Paradigm for the Second Amendment, 22 Law & Hist. Rev.
    161, 165 (2004) ......................................................................... 39

Frassetto, *Firearms and Weapons Legislation Up To the Early 20th Century*
    https://ssrn.com/abstract= 220091 .......................................... 42

Don B. Kates, Jr., *The Second Amendment: A Dialogue*,
49 J. Law & Contemp. Probs. 143 (1986)............................................................38

Greenlee, *The Historical Justification for Prohibiting Dangerous Persons From Possessing Arms*, 20 Wyo. L. Rev. 249 (2020)...............................................41,43

https://www.palrb.gov/Preservation/Smith-Laws/View-Document/17001799/1718/0/act/0236.pdf ........................................................45

Marshall, *Why Can't Martha Stewart Have a Gun?*,
32 Harvard J. Law & Pub. Pol'y 695 (Spring 2009)..........................................38

Reynolds, *A Critical Guide to the Second Amendment*,
62 Tenn. L.Rev. 461, 480 (1995) ......................................................................38

Volokh, *State Constitutional Rights to Keep and Bear Arms*,
11 Tex. Rev. L. & Pol. 191, 208-10 (2006)........................................................38

# I.    ISSUES PRESENTED

A.    As to a charge of possessing a gun in furtherance of a drug offense under 18 U.S.C. §924(c), given a recent (but unknown to the parties) change to Ninth Circuit Model Instruction 14.23 explaining "in furtherance of;" where the defense sought an instruction explaining that possession had to "advance or promote" the drug offense; and stated that its "central theory" of defense was that the gun did not because of its inaccessible location in a small backpack – did the district court commit non-harmless error in giving *no* instruction jury at all on "in furtherance of?"

B.    Does *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022) render 18 U.S.C. §922(g)(1) unconstitutional as applied to Mr. Alston, and invalidate his convictions under 18 U.S.C. §922(g)(1) on two counts of being a felon in possession of a firearm based on his prior convictions for Washington burglary?

## II.    JURISDICTIONAL STATEMENT

### A.    Jurisdiction, Timeliness, and Bail Status

The district court had jurisdiction under 18 U.S.C. §3231, and this Court has jurisdiction under 28 U.S.C. §1291.    Appellant Kendall Alston was sentenced, and his notice of appeal filed, on February 22, 2023.    (1-ER-2; 4-ER-606-607)[1]    He is in the custody of the Bureau of Prisons; its website indicates a release date of July 28, 2026.

### B.    Nature of the Case, Course of Proceedings, and Judgment Appealed

This appeal is from Mr. Alston's conviction, after jury trial, on a five-count indictment charging him under 21 U.S.C. §841(a)(1), (b)(1)(C); 18 U.S.C. §924(c); 18 U.S.C. §922(g)(1).    Counts 1 and 2, respectively, charged him with distribution of fentanyl and possession with intent to distribute it; Count 3 with possession of a firearm in furtherance of the two fentanyl offenses; and Count 4 with being a felon in possession of a firearm.    (4-ER-601-603)    After the trial on those counts he pleaded guilty to Count 5, also charging him with being felon in possession of a firearm on a different occasion.    (4-ER-603).

———————————————

[1]"ER" means "Excerpt of Record," "CR" means Clerk's Record, and "PSR" means the Presentence Report, filed separately under seal.

12

### III.   STATEMENT OF THE CASE

**A.     The indictment**

The jury trial evidence on the first four counts detailed events on March 23, 2022.   Respectively, these charged Mr. Alston with distributing fentanyl; possessing it with intent to distribute it; possessing a firearm in furtherance of the fentanyl offenses; and being a felon in possession of the firearm.   Count 5 charged him with being a felon in possession of a different handgun about two months earlier, on January 22.   The parties agreed to bifurcate proof on that count under *Old Chief v. United States*, 519 U.S. 172 (1997).   (CR 66, 4-ER-615)

**B.     Trial evidence on Counts 1-4**

The area of Third Avenue between Pike and Pine Streets is in "the downtown core of Seattle," with retail stores for the purchase of clothing and consumer goods.   (2-ER-68-69; 3-ER-227)   To the police, the area was also an "open-air market" for the purchase or sale of drugs.   (3-ER-227-8)   People there for drug activity were wary of the police and would want to move away if they saw law enforcement.   (4-ER-410)   Brandon Dorr, a Seattle Police Department ("SPD") officer, was on the third floor of a building at the corner of Third and Pike Street, looking at the area through binoculars.   (3-ER-149-150)   He was in radio contact with four officers in a police car – unmarked but equipped with lights and a siren – parked at Second Avenue and Pike Street.   The job of these four officers, which included Officers Todorov and Lindelef, was to listen for Dorr's radio instruction to arrest a described suspect, which they would then do.   (3-ER-241-2)

From his observation spot Dorr noticed a person, who later turned out to be Mr. Alston, walking on the block of Third Avenue between Pike and Pine.   He wore a letterman-style coat and red shoes; on his back he carried a small, zipped-

13

shut dark-red backpack. He was doing what Dorr had observed drug dealers do in the area, "tripping around," occasionally interacting with people who came near him as he "walk[ed] laps," but then, when his business with them was done, he would "just keep moving." (3-ER-152, 155-156; 4-ER-589-590) Dorr saw him touch hands with a man, but did not see what, if anything, was in either man's hand when this happened. (3-ER-156-157) Thinking a drug sale had taken place, Dorr went down to the street and positioned himself near Mr. Alston, separated by a sidewalk bike rack. From there Dorr pretended to be arguing with someone on his cell phone while he watched. (3-ER-164-165) He saw Mr. Alston with a man who was "dirty" and "didn't look healthy." (3-ER-171) Mr. Alston took something from his coat pocket, which Dorr saw as some small, uncountable number of blue pills; Mr. Alston passed them to the man, took money, and put it in a pants pocket. (3-ER-170-172) Dorr, seeing this, radioed the arrest team, describing Mr. Alston's letterman-style jacket and directing them to arrest him. They drove up in their car and did so. (3-ER-173-174, 4-ER-380)

Todorov and Lindelef searched Mr. Alston's person and his backpack. On Mr. Alston's person, cash totaling about $47 was found in his left and right pants pocket, as well as some cigarettes. In the letterman coat's right-side pocket was a baggie containing 243 or 244 blue pills. (3-ER-253-254, 267, 286-287, 383) Testing of nine of blue pills showed they contained fentanyl. Under a DEA protocol, it was likely that 70% of the total number also contained fentanyl. (3-ER-322-324)

As reflected in a one-and-a-half minute video admitted as Government's Exhibit 13.1, (2-ER-76) Lindelef and Todorov removed the backpack from Mr. Alston's shoulders and laid it flat on the hood of the police car with the straps face down. Todorov then picked it up, unzipped it, repositioned it when he saw it

14

contained a gun, and searched through it.   In one pocket was a laptop-computer power supply, or charger, in its box.   In another was a .45 caliber handgun with the safety on, one round in the chamber, and four rounds in the magazine, though it would have held nine or ten.   (2-ER-76-79)   Todorov said he had no difficulty taking the gun from the backpack.   (2-ER-78)   However, in Government's Exhibit 13.1, the gun briefly catches on something in the pack before he removes it.   (Government's Exhibit 13.1, at 1:23).   The gun, backpack, and power supply were admitted at trial, as were photographs, also admitted as exhibits.

  

(4-ER-588-590)

   Lindelef thought the backpack, with its zipper, was better than nothing as a way to hold the gun, which otherwise might fall or be lost without being in it, but it was not as good as having a holster.   (4-ER-414)

   During the trial, the defense sought three times to give the jury a demonstration of what a person also wearing the letterman coat would have to do to get access to the gun – remove enough of the backpack from his person to unzip it and take the gun from the compartment.   The defense proffered an orange rubber replica gun of the same size as, but of a lighter weight than the real gun, and the district court had approved its use as a demonstrative exhibit.   (4-ER-369-370) The real gun itself was disabled and not in the same condition as when the police

15

seized it.   Mr. Alston's counsel first asked Lindelef, the officer who conducted the search, to do a demonstration; the government's objection was sustained. Alternatively, counsel asked to have Mr. Alston himself conduct the demonstration; and thirdly, counsel offered to do it himself.   The court denied these requests also.   (3-ER-418-419)   The district court later reasoned that the "modeling" by either Mr. Alston or his counsel would have been misleading to the jury for the same reasons – different undershirts, potential weight changes" and, also, the "OJ-with-the-glove-modeling issues."   (4-ER-566)

The parties had entered into a stipulation as to the out-of-state manufacture of the gun and to Mr. Alston's having knowingly sustained prior felony convictions.   (CR 66)   The jury convicted Mr. Alston of Counts 1, 2, 3, and 4 – the two drug offenses, the 924(c) firearm count, and the felon in possession count, the gun counts relating to the .45 caliber handgun.   (4-ER-567-571)

**Guilty plea to Count 5**

Mr. Alston chose not to have the jury resolve Count 5 under the bifurcation stipulation, but pleaded guilty to it instead.   In his plea colloquy he agreed he knew he was a felon on the previous January 22, in Bellevue, Washington, and he possessed a .38 caliber handgun that day.   (4-ER-572-583)   At sentencing, the PSR narrative, which Mr. Alston did not concede to be fully accurate, said the handgun was in a "small sling backpack Mr. Alston was wearing," and was found there after his arrest for shoplifting outside a department store.   Not indicated in his plea colloquy, the PSR, or by the government was any mention of drugs in his possession on this date.   (PSR ¶9, CR 138)

**Sentencing**

The district court imposed a one-day sentence on the drug offenses, counts 1 and 2, and the felon-in-possession offenses, Counts 4 and 5, concurrent; and 60

16

months, consecutive, on Count 3, the 924(c) count.   (1-ER-2-3)   The predicates for Mr. Alston's felon-in-possession charges were two residential burglaries, one committed a little less than nine years, the other a little more than five years, before his current offenses (with later conviction dates).   (4-ER-602-603; PSR ¶¶52, 54) He has four earlier burglary or attempted burglary convictions.   (PSR ¶¶45-48)

## IV.   SUMMARY OF ARGUMENT

Mr. Alston's drug offense consisted of quick, on-the-move street sales of small numbers of fentanyl pills on a city block where he and his customers were wary of a police presence.   He carried a handgun in a small backpack on his back as he moved along.   He was charged with possessing the handgun in furtherance of these drug sales.   Before trial, he sought but was denied an instruction defining the phrase "in furtherance of," telling the jury that "in furtherance of " meant they had to find he "possessed the firearm to advance or promote" the offense.   This instruction was not dissimilar to a revision in Ninth Circuit Model Criminal Jury Instruction 14.23 that this Court had approved around the time of trial, but which neither the parties nor the court referenced.   The district court gave no instruction explaining the meaning of "in furtherance of" at all.   This was non-harmless error and requires reversal of Mr. Alston's conviction on Count 3.

The Supreme Court's decision in *New York State Rifle & Piston Ass'n v. Bruen*, 142 S.Ct. 2111 (2022) invalidates 18 U.S.C. §922(g)(1), the felon-in-possession statute as applied to Mr. Alston in two counts of the indictment.   Under *Bruen*'s two step test, he is one of "the people" with an individual, non-militia-connected right to keep and bear arms for home- and self-defense under the Second Amendment.   Neither the amendment's text nor any "relevantly similar" provision in this country's historical tradition of arms regulation support the criminalization of his exercise of this right based on his Washington burglary convictions.

17

# V.   ARGUMENT

## A.   Mr. Alston adequately objected to the district court's giving the jury no instruction on the meaning of the phrase "in furtherance of," the refusal to do was error, and the error was not harmless.

### 1.     Standard of review

An objected-to omission of an element in a jury instruction is subject to harmless-error analysis.   It requires reversal unless there is no reasonable possibility that the error materially affected the verdict or, in other words, that the error was harmless beyond a reasonable doubt.   *United States v. Cortes*, 757 F.3d 850, 857-858 (9th Cir. 2014); citations omitted.   Where the objection is to the formulation of an elements instruction, the omission or misdescription is only harmless if on the evidence the jury necessarily found, or had to have found, the omitted or misdescribed component.   *See United States v. Lopez*, 100 F.3d 98, 103 (9th Cir. 1996).

### 2.     Mr. Alston adequately objected to the district court's refusal to include any explanatory language about "in furtherance of," by opposition and by proffering an instruction giving meaning to it.

Mr. Alston's attorney (his third) entered the case in June with the expectation of going to trial in July.   He made clear the defense position – that the §924(c)-elements jury instruction was error because it did not explain the meaning of "in furtherance of."   He affirmatively asked the court for Ninth Circuit Model Criminal Jury Instruction 14.23, the version in effect beginning in 2011, which did not define "in furtherance of," *and* a customized instruction #2, which did:   "'in furtherance of' means to help forward, to promote, to advance or to give aid to. To prove that the defendant possessed a firearm 'in furtherance of' drug

trafficking, you must find that the *defendant possessed the firearm to advance or promote the commission of the underlying crime*." (1-ER-21) (emphasis added)

The parties and court worked from the 2011-promulgated version of Instruction 14.23 during trial. Its elements were proof of commission of the specified qualifying offense; proof of knowing "possession" of the firearm, with an explanation of what that meant; and proof that the defendant's possession was "in furtherance of" the underlying offense, with no explanation of what that phrase meant. *See* Manual of Model Criminal Jury Instructions, Instruction No. 14.23, https://www.ce9.uscourts.gov/jury-instructions/node/530 (last visited June 5, 2023).

Both parties briefed Mr. Alston's proposed instruction during June in preparation for the July trial date. However, at some point around the time of the scheduled trial, in June or July 2022, this Court approved the following added language to 14.23, which is still in effect: "The phrase 'in furtherance of' means that the *defendant possessed the firearm with the subjective intent of promoting or facilitating*" the qualifying offense. *See* Manual of Model Criminal Jury Instructions, Instruction No. 14.23, https://www3.ce9.uscourts.gov/jury-instructions/node/1196 (last visited, July 11, 2023) (emphasis added).

Neither the transcripts nor the parties' written briefing mentioned the 2022 revision of Instruction 14.23. In his papers, Mr. Alston initially argued that the 2011 version of 14.23 did not adequately explain what "in furtherance of" meant, and cited language supporting his wording in *United States v. Hector*, 474 F.3d 1150, 1157 (9th Cir. 2007). (1-ER-21-) The government, also still working from the 2011 version, answered that "the model instruction is accurate and needs no tinkering." In support, it cited *United States v. Irons*, 31 F.4th 702, 710 (9th Cir. 2022), which found "no error" in the district court's refusing to define "in

furtherance of" initially, and in later refusing a defense instruction telling the jury that mere possession was insufficient and the defendant had to have "intended that the weapon promote or facilitate" the qualifying drug offense. (4-ER-592-594) In reply, Mr. Alston pointed out that the government had conceded in *Irons* that the proposed defense instruction there – which encompassed Mr. Alston's own – correctly stated the law. Moreover, he noted, multiple form instructions from other circuits agreed with this language. (4-ER-596-600)

Nor did either side, or the district court, reference the 2022 version of Instruction 14.23 at the pretrial status conference. In expounding on the expected video evidence about how the gun was situated in the pack, and his proposal to use a rubber replica gun to illustrate the awkwardness and difficulty for the pack-wearer to get at the gun, Mr. Alston's counsel argued that their defense to the §924(c) count was premised on the meaning of "in furtherance of." This choreography, he said, meant that "[n]obody carrying a weapon like that, in that fashion, under those circumstances, is carrying a weapon in furtherance." (1-ER-16) When the discussion turned to the instructions, he contended that his instruction was needed to support the defense's "central theory of the case" on the 924(c) charge. It would "show the centrality of the concept and give it some definition." This definition was needed to give the defense "a hook to show them [the jury] that that's actually the law." (1-ER-17-19) However, the district court decided that "I'm going to leave the jury instruction as it is." (1-ER-19)

Trial was continued to August because of "health concerns." (CR 160:16-19) But when it began the district court acknowledged that the defense had adequately preserved its objection on the "in furtherance of" issue. (1-ER-13-14) At trial it later gave the jury the 2011 version of 14.23. (1-ER-9-12)

**B.     The rejection of Mr. Alston's instruction on the meaning of "in furtherance of" was not harmless error because the jury did not find that he subjectively intended to promote his offense by having the gun where he did.**

The appropriate harmless-error inquiry for either the omission to instruct on an element of the offense, or a misstatement in giving such an instruction, is as follows:   whether, (1) based on the instructions given, what the jury *must* have found in order to convict; and (2) whether its findings necessarily included all the required elements of the charged crimes.   *United States v. Mendoza*, 11 F.3d 126, 129 (9th Cir. 1993).   The instruction here does not allow those findings.

The language Mr. Alston sought, and the similar language this Court added in the 2022 version of Instruction 14.23, all draw from this Court's authority about what it means to possess a firearm "in furtherance of" a drug trafficking crime under §924(c).   For almost 20 years, it has held that a conviction for this offense requires not just a showing of possession, but also a mental-state component – "proof that the defendant possessed the weapon to promote or facilitate the underlying crime.   [Citations omitted]   In other words, this element of §924(c) turns on the intent of the defendant."   *United States v. Krouse*, 370 F.3d 965, 967 (9th Cir. 2004).   For the government to prove this intent beyond a reasonable doubt, it must show "a nexus between the gun[ ] discovered and the underlying offense." *Id*. at 968.

That nexus was lacking here.   This is not a situation in which "the omitted or misstated element in the instruction was uncontested and the proof of it supported by overwhelming evidence, so that the jury verdict would have been the same absent the error."   *United States v. Collazo*, 984 F.3d 1308, 1336 (9th Cir. 2021), *citing Neder v. United States*, 527 U.S. 1, 17 (1999).   The gun here was not part of a mini-arsenal and "strategically located within easy reach" of drugs and

21

weighing paraphernalia in a stationary room seemingly devoted to storing them. *Krouse*, *supra*, 370 F.3d at 968. It was not placed readily convenient on the path to a room where drugs were kept and drug transactions were shown to occur. *Hector*, *supra*, 474 F.3d at 1158. The gun was not in the possession of someone who brandished the gun as he got out of his car outside an apartment, which he entered and left, either delivering drugs or picking up drug proceeds, which were later found in the car. *United States v. Lopez*, 477 F.3d 1110, 1111 (9th Cir. 2007). These cases teach that proximity to a weapon may be critical when the activity is a stationary drug storage place, or when either drugs or proceeds are in transit. A jury could easily find a nexus between the specific kind of drug activity in those cases, and the defendants' intent in having the guns there to facilitate it.

The lack of nexus and erroneous instruction here were highlighted because Mr. Alston's conduct was distinctly different from that shown in other cases raising the "in furtherance of" question. His offense involved public though furtive, constant, swift, and above all brief hand-to-hand contact sales to customers, some of them down-and-out, all with money ready to quickly complete the sale. The gun's location was not "strategic" for furthering this kind of transaction: it was too heavy to keep in his pocket to protect the money there, and it was too awkward to keep in the coat pocket with the drugs there, since it would interfere with the quick movements needed to reach for the right number of pills and pull them out, to make the sale and keep moving along. Precisely because Mr. Alston moved so quickly in conducting each transaction, both the money in his pockets and the drugs in his coat were difficult targets for a thief, who might have been more likely to grab the backpack from Mr. Alston's back and run away with it – taking the gun in the process. Ultimately, Mr. Alston and his buyer were doing their business in public, with both sides in this transaction more intent on

avoiding conflict, including a gun's display, that could have drawn unwanted attention from the police.

Without these subjective considerations in play, Mr. Alston was able to argue only the practical difficulty with access, including the police acknowledgment that the gun, stored in the backpack, was harder to access than if it had been carried in a holster. The prosecutor argued that if the wearer of the pack removed at least one arm from the backpack loops, unzipped the pack, reached in for the gun among the other belongings there, and unlatched its safety, with practice he could use it. (4-ER-528) There was no evidence that Mr. Alston had done so, of course. The benefit of an instruction telling the jury that more than "could" was necessary would have been critical to answering this argument.

All of this evidence supported Mr. Alston's request for an instruction requiring his intent to promote a drug offense by carrying the gun in the pack. He could plausibly argue that the weapon's location did not provide "strategic" proximity, and that the government had not successfully shown he had the gun to facilitate his swift, public drug transactions. A defendant is entitled to an instruction concerning his defense theory if it is legally sound and evidence in the case makes it applicable. *United States v. Cortes*, 757 F.3d 850, 858 (9th Cir. 2014). Mr. Alston's proffered instruction was needed precisely so he could answer the prosecutor's case, to show how the impracticality and difficulty in the gun's location subtracted from the strength of the government's premise.

By contrast to situations in which this Court has considered the evidence of a nexus "overwhelming," there is a plausible question whether the evidence was sufficient for a rational juror to find Mr. Alston *intended* the firearm to facilitate *those* drug offenses, versus finding his possession at the time he was on the street

23

made it "in furtherance of" them.   "Recognizing that [he] does not have to show that it is more likely than not that a jury would have acquitted him," this is enough to show the error was not harmless.   *Irons*, *supra*, 31 F.4th at 714-715.

Indeed, *Irons* illustrates the sort of situation that this case presents.   The defendant there had a wholesale amount of drugs and sale paraphernalia, including a scale, in one room, and a gun in the mattress of the bed in that room.   "But under the instructions as given, the jury did not need to make any finding as to this disputed issue of Irons' subjective intent; an objective connection was enough." *Id*.   Consequently, the intent question was simply not presented for the jury's consideration.   That error sufficiently weakened confidence in the verdict to warrant reversal.

So it is here.   Ultimately, the question is whether this jury, if instructed as it should have been, would have concluded beyond a reasonable doubt that – knowing the nature of his business that day, and the milieu in which he would be working – Mr. Alston intended to have the gun, in the place where he kept it, to facilitate what he was doing.   There is a plausible doubt about that, and the jury instruction error here was not harmless.

24

**C.      This Court should overrule its decisions in *United States v. Vongxay* and *United States v. Chovan*, based on the Supreme Court's decision in *New York State Rifle & Pistol Assn. v. Bruen*, \_\_\_ U.S. \_\_\_, 142 S.Ct. 2111, 2127-2128 (2022).**

> **1.      Rather than being "presumptively lawful" under *Vongxay* and evaluated for means-end validity under *Chovan*, §922(g)(1), is subject to *Bruen*'s textual-historical test for evaluating Second Amendment challenges to arms regulations, with the burden resting on the government.**

In *Heller v. District of Columbia*, 554 U.S. 570 (2008), the Supreme Court held for the first time that the Second Amendment codified a historically preexistent individual right to keep and bear arms.   It conducted a historical analysis reflecting recognition of this individual right, beginning with the context provided by the English right to arms, with strong emphasis on the colonial- and founding-era period in which the Second Amendment was passed, consideration of Reconstruction-era sources, and very little on the late-19th and 20th centuries.   *Id.* at 600-619.   The court's own precedent, it said, could be read as hinting at the existence of the right.   *Id.* at 619-621.   Thus, the amendment's textual reference to "the right of the people" encompassed the right to arms not merely during militia service, but also "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."   *Id.* at 621-624, 635.

At the same time, *Heller* said the right to arms it now found was "'not unlimited," and that

> Although we do not undertake an exhaustive historical analysis
> today of the full scope of the Second Amendment, nothing in our
> opinion should be taken to cast doubt on longstanding prohibitions

>on the possession of firearms by felons and the mentally ill, or laws
>forbidding the carrying of firearms in sensitive places such as schools and
>government buildings, or laws imposing conditions and qualifications
>on the commercial sale of arms.

*Id*. at 626, together with a footnote calling this series of prohibitions a non-exhaustive "list" of "presumptively lawful" arms regulations.

Post-*Heller*, even before adopting the intermediate-scrutiny means-end test in *Chovan*, this Court turned away a Second Amendment challenge to §922(g)(1) in *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010). Though the Supreme Court clearly said in *Heller* that it expressly did not undertake a historical analysis of the colonial- or founding-era perspective on the right to arms vis-à-vis felons, *Vongxay* simply relied on the "list" of supposedly undoubted, valid, "presumptively lawful" regulations, which included prohibiting felons from arms possession. *Id*. at 1115. It treated this language as part of *Heller*'s holding, an "integral" limitation on the scope of the individual right to arms, not – as dicta would be – "unnecessary to the ruling." *Id*. This reasoning essentially adopted the view that statutes like §922(g)(1) embodied the necessary historical analysis.

*Vongxay* cited two other propositions to buttress its holding. The first relied on reasoning overruled by *Heller*, that the Second Amendment right to arms encompasses only militia service. *Vongxay*, 594 F.3d at 1116, *citing United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005), which in turn expressly relies on *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002). *Silveira* concluded that the Second Amendment's text and historical underpinnings showed "it was not adopted in order to afford rights to individuals with respect to private gun ownership or possession." *Id*. at 1087. Both *Heller* and *Bruen* overruled this holding. *Vongxay* also read *Lewis v. United States*, 445 U.S. 55 (1980) as

26

suggesting no individual Second Amendment right to arms existed, disregarding
*Heller*'s view that this language was "gratuitously" included.  *Heller*, 554 U.S. at
625, n. 25.  *Silveira* also applied a degree of means-end reasoning to find that the
California semi-automatic weapons regulation there was within the government's
power to promulgate.  *Silveira*, 312 F.3d at 1087.  This too was expressly
overruled by *Bruen*.

   *Vongxay*'s alternate holding assumed for the sake of argument that there *is*
an individual right to arms in the amendment, but – again, taking that "one step too
many," held that the government may reasonably regulate it, through a form of the
means-end scrutiny *Chovan* later adopted.  This part of its holding recognized that
other circuits, including the Fifth Circuit, had found an individual right to arms in
the Second Amendment; but if that view was correct, this Court approved of its
mean-end scrutiny, which held that, weighed against a counterbalancing
government interest, "felon restrictions are permissible even under heightened
scrutiny."  *Vongxay*, 594 F.3d at 1117, *citing United States v. Everist*, 368 F.3d
517, 519 (5th Cir. 2004) (turning away a 922(g)(1) facial challenge by a defendant
previously convicted of robbery because "[i]rrespective of whether [the] offense
was violent in nature," the law was facially valid because felons have demonstrated
a "manifest disregard for the rights of others").  In the same vein was *Vongxay*'s
approval of District of Columbia Circuit language, also finding an individual
Second Amendment right to arms, but affirming the government's power to
reasonably regulate it.  *Vongxay*, 594 F.3d at 1117, *citing Parker v. District of
Columbia*, 478 F.3d 370, 399 (D.C.Cir. 2007).

   This second rationale foreshadowed the next circuit-level response to *Heller*.
This Court, like most other circuits, adopted an intermediate-scrutiny means-end
analysis to weigh the validity of gun regulations.  It "(1) asks whether the

challenged law burdens conduct protected by the Second Amendment, and (2) if so, directs courts to apply an appropriate level of scrutiny."   As to §922(g), which strips arms possession rights from several categories of perhaps non- "law-abiding, responsible" people, intermediate scrutiny applies.   This Court demanded an "important government interest" that could outweigh §922(g)'s severe, "total prohibition" on the right to arms by domestic violence misdemeanants.   *See United States v. Chovan*, 735 F.3d 1127, 1131-1136 (9th Cir. 2013) (turning away a Second Amendment challenge to 18 U.S.C. §922(g)(9) based on an important government interest in preventing domestic violence).

Now, *New York State Rifle & Pistol Assn. v. Bruen*, ___ U.S. ___, 142 S.Ct. 2111, 2127-2128 (2022), has rejected the means-end approach.   It has set out a "methodology centered on constitutional text and history" to evaluate Second Amendment arms regulation challenges.   It invalidated a discretionary public-carry permitting program in part because the Second Amendment says "[n]othing *in the text* draw[ing] a home/public distinction with respect to the right to keep and bear arms."   Emphasis added.   As for history, it directs courts to look – as the Supreme Court itself had done in *Heller* – to the "normal and ordinary" historical meaning of Second Amendment's "textual elements," focusing primarily on the founding-era period, when it was enacted.   *Id*. at 2127.   Indeed, this court indicated that the second step of cases like *Chovan*, with its judicially-informed means-end balancing, and the burden on the individual rather than the government, was in fact "expressly rejected" in *Heller*.   It is "one step too many" after consideration of the text and history. *Id*. at 2127-2128.

28

The upshot is that *Bruen* sets out a selectively historical[2] two-step inquiry for arms regulations: (1) whether "the plain text of the Second Amendment covers an individual's conduct," in which case "the Constitution presumptively protects" it, and (2) whether the government can overcome this presumption by pointing to a "well-established and representative historical analogue" to the challenged regulation "consistent with this Nation's historical tradition." 2129-2130, 2133.

> **2.** ***Vongxay*'s presumption of validity and interest-balancing test for evaluation of arms regulations, as expressly set out in *United States v. Chovan*, is overruled by *Bruen*.**

*Vongxay* was decided in 2010, *Bruen* in 2022. Though this Court has not addressed an as-applied challenge to the constitutionality of §922(g)(1) after *Bruen*, it has not ignored the case. It recently recognized that *Chovan*'s two-step intermediate-scrutiny test has been "rejected…as 'one step too many.'" *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023).

Mr. Alston submits that the *Bruen* framework now calls for the panel here to overrule *Chovan* and *Vongxay*. "Where the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority, and should reject the prior circuit opinion as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 893 (9th

---

[2] The court reiterated, as it had in *Heller*, that the right to arms under pre-colonial English law may provide context, but the primary inquiry is into the understanding of the right in founding-era American communities; and, to a lesser degree, materials from Reconstruction. Late 19th century and 20th-century law "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S.Ct. at 2154, n. 28.

Cir. 2003) (en banc). *Vongxay*'s reasoning and holding are "clearly irreconcilable" with both *Heller* and, now, *Bruen*.

First, *Bruen* reallocated the presumptions that apply to Second Amendment arms-regulation challenges, a change that ample authority has recognized as meeting *Miller*'s clearly-irreconcilable standard. By treating *Heller*'s seeming list of exceptions as longstanding and historically valid, including felon-disarmament regulations, this and other courts have continued to place the burden on individuals to produce countering historical evidence. *Bruen* flips this burden, treating an Second Amendment's textual reference to "the people" as presumptively granting a qualifying individual challenger the right to arms unless the government produces a satisfactory historical analogue that says otherwise.

These types of shifts in presumptions or burdens of going forward have previously been recognized as a basis for overruling previous authority in various areas of the law. *See Cottonwood Environmental Law Center v. U.S. Forest Service*, 789 F.3d 1075, 1089-92 (9th Cir.2015) (circuit precedent that presumed harm and eligibility for injunctive relief in complaint alleging procedural violations of the Endangered Species Act, and which put burden on the agency to show otherwise, was overruled by intervening Supreme Court authority requiring an irreparable-harm showing from plaintiffs); *Jordan v. Nationstar Mortgage, L.L.C.*, 781 F.3d 1178, 1182-84 (9th Cir. 2015) (finding circuit authority strictly limiting defendants' right to remove state-court class actions to federal court was overruled by Supreme Court authority holding that "no antiremoval presumption" applied to prevent defendants from seeking it); *SEIU v. Los Robles Regional Medical Center*, 976 F.3d 849, 855-856 (9th Cir. 2020) (circuit precedent permitting arbitrators, not courts, to determine if labor disputes were arbitrable, was fatally undercut by "the *theory* or *reasoning*" of Supreme Court authority that the arbitrability of labor

agreements, depending on the type of question, was no different from other commercial disputes, and were presumptively a question for the court *unless* the agreement contained a clear indication otherwise); *Lambert v. Saul*, 980 F.3d 1266, 1274-76 (9th Cir. 2020) (the Social Security Administration's agency statutory interpretation that neutral assessments, without a presumption of continuing disability, was due deference because intervening Supreme Court authority limited when judicially-created presumptions could trump such agency determinations. These cases reflect that *Miller*'s standard for overruling precedent is satisfied by Supreme Court authority that redirects presumptions, as *Bruen* did:   from a presumption that arms regulations are historically valid and a litigant must show they are not, to a presumption of invalidity unless the government demonstrates that history shows otherwise.

Secondly, this Court has found *Miller*'s standard met when an intervening Supreme Court decision changes the legal analysis by repudiating a previously-employed analytical framework – as *Bruen* did when it rejected the "judge-empowering interest-balancing inquiry" utilized by *Vongxay* and *Chovan*.   *Bruen*, 142 S. Ct. at 2129.   Overruling of precedent on this ground has occurred frequently in criminal law.   *See United States v. Dixon*,  984 F.3d 814, 819-20 (9th Cir. 2020) (Supreme Court authority holding that either invasion of a reasonable expectation of privacy or a physical trespass could qualify as a Fourth Amendment search was fundamentally irreconcilable with prior circuit precedent recognizing only violations of the expectation of privacy as Fourth Amendment intrusions); *United States v. Paixao*, 885 F.3d 1203, 1208 n.2 (9th Cir. 2018) (recognizing that the circuit rule qualifying an institution as one receiving federal benefits if it receives funds for purposes of under 18 U.S.C. § 666 was overruled by intervening Supreme Court precedent looking more generally to "the purposes and  operation of

the…federal program" at issue); *United States v. Castillo*, 69 F.4th 648, 656-58 (9th Cir. 2023) (*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), permitting deference to agency interpretations of its rules only when they are "genuinely ambiguous," abrogated the circuit rule treating Sentencing Guidelines commentary as controlling if it was not inconsistent with the applicable guideline); *United States v. Ferguson*, 560 F.3d 1060, 1068 & n.4 (9th Cir. 2009) (holding that *Indiana v. Edwards*, 554 U.S. 164 (2008), which allowed a higher standard for evaluating a defendant's competency for self-representation than for competency to stand trial, effectively overruled prior Circuit precedent equating the two standards).

Thirdly, this Court has repeatedly found *Miller*'s standard met when intervening Supreme Court authority uses a "mode of analysis" inconsistent with a rule employed in prior circuit cases. *In re Stern*, 345 F.3d 1036, 1043 (9th Cir. 2003). *See United States v. Plouffe*, 445 F.3d 1126, 1128-1130 (9th Cir. 2006) (prior precedent finding no pre-*Booker* appellate jurisdiction over criminal sentences falling within the applicable Guidelines range was clearly irreconcilable with *Booker*, which held the guidelines were no longer mandatory but advisory, and this made all the difference – now, because sentences may be illegal even if they are within an advisory range, appellate courts must review sentencing reasonableness under 18 U.S.C. § 3553(a) to carry out review of non-guidelines factors).

The Supreme Court's substitution of a new legal test for a mode of analysis previously employed by Circuit was treated as a fundamental change in the law overruling the prior Circuit precedent. *Bruen* does that. It explained that *Heller* had "declined to engage in means-end scrutiny" because the Second Amendment's text asserting the right to arms "takes out of the hands of government…the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."

*Bruen*,. 142 S.Ct. at 2129, *quoting Heller*, 554 U.S. at 634 (emphasis in original). It rejected the means-end balancing around which the circuits, including this one, "coalesced" after *Heller* as a misguided gloss on *Heller* itself. *Bruen*, 142 S.Ct. at 2125, 2129. Moreover, it applied its new, text- and history-focused mode of scrutiny to a concealed-carry gun regulation that actually may fall within the category of one of the "presumptively lawful" regulations in *Heller* (prohibiting "the carrying of firearms in sensitive places"). This mode of analysis surely undercuts this Court's view that the "presumptively lawful" list was part of *Heller*'s holding, not dicta, and does away with the notion that courts may begin addressing a Second Amendment challenge by *presuming* that §922(g)(1) is historically valid.

This development requires this Court to jettison *Vongxay* and apply an entirely new analysis focused on the Second Amendment's text and history. However, *Vongxay* did no more than dip a toe into the historical analysis pool. Toward the end of the opinion, it posited that *if* the Second Amendment encompassed an individual right, felons might not enjoy it, because their conduct meant they are not members of the "*virtuous* citizenry" with Second Amendment rights. *Vongxay*, 594 F.3d at 1118 (emphasis added). But because the panel held there was no individual Second Amendment right to arms, it went no deeper. This is a fundamental way in which *Vongxay* is "clearly irreconcilable" with *Bruen*, and must be overruled.

**E.     Mr. Alston's felon-in-possession convictions in Counts 4 and 5 must be reversed because 18 U.S.C. §922(g)(1) is unconstitutional as applied to him under *Bruen*.**

**1.     Mr. Alston has good cause for not having raised a Second Amendment challenge to his §922(g)(1) convictions below.**

An as-applied challenge to the constitutionality of a criminal statute is a challenge to the sufficiency of the crime set out in the charging instrument, and such challenges must normally be raised before trial.   Fed. R. Crim. Proc. 12(b)(3)(B).   This Court has not said whether a pre-trial filing is required before the claim be considered on appeal, but has imposed a good-cause explanation for the failure to do so in the context of new suppression-motion arguments presented for the first time on appeal.   *United States v. Guerrero*, 921 F.3d 895, 898 (9th Cir. 2014).

The good cause standard is satisfied, however, in circumstances like these – when an argument for dismissal under *Bruen* would have been rejected as foreclosed by this Court's authority.   *United States v. Aguilera-Rios*, 769 F.3d 626, 630-631 (9th Cir. 2014).   As the following chronology shows, no challenge to §922(g)(1) under *Bruen* succeeded in any of the Courts of Appeals, including this one, until *after* Mr. Alston's sentencing, when the Third Circuit decided *Range v. Attorney General*, 69 F.4th 95 (3d Cir. 2023):

| | |
|---|---|
| 2/8/19 | Post-*Bruen*, this Court rejects a Second Amendment challenge to Hawaii's gun-permitting regime in *Young v. Hawaii*, 915 F.3d 681 (en banc) under *Heller* |
| 5/5/22 | Mr. Alston indicted |
| 6/23/22 | *Bruen* decided |
| 8/8/22 | Mr. Alston' trial begins; he is convicted three days later |
| 8/19/22 | Following directions to reconsider its *Young* decision in light of *Bruen*, this Court remands to the district court in the first instance.   *Young v. Hawaii*, 45 F.4th 1087 (9th Cir. 2022) |

|         | (O'Scannlain, J., dissenting from remand order). |
|---------|---------------------------------------------------|
| 2/22/23 | Mr. Alston sentenced, notice of appeal filed that day |
| 6/23/23 | *Range v. Attorney General*, 69 F.4th 95 (3d Cir. 2023), finds §922(g)(1) invalid as applied under the Second Amendment to a non-violent felon |
| 6/30/23 | Supreme Court acts in *United States v. Rahimi*, 61 F.4th 443, (5th Cir. 2023), *cert. granted*, *Rahimi v. United States*, No. 23-915, https://www.supremecourt.gov/docket/docketfiles/ html/public/22-915.html (last visited July 5, 2023) (holding that §922(g)(8) violated Second Amendment arms possession rights of people subject to domestic violence restraining orders) |

This Court should find good cause here. True, it has not yet applied *Range* to §922(g)(1), and the Supreme Court has not yet applied *Bruen* to any provision of §922(g). However, if developing authority supports Mr. Alston' Second Amendment claim here while his appeal is pending, this Court would "apply the law in effect at the time it renders its decision." *Commonwealth of Northern Mariana Islands v. Mendiola*, 976 F.2d 475, 481 (9th Cir. 1992). A new rule may apply retroactively where it is pending on direct review and not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past. *United States v. Door*, 996 F.3d 606, 614 (9th Cir. 2021).

If this Court finds a reason for remanding based on the preceding sections, Mr. Alston does not object to remand for the district court to consider this issue in the first instance, as occurred in *Young*. *See also Garland v. Atkinson*, 70 F.4th 1018, 1020 (7th Cir. 2023) (choosing remand because on appeal "the parties' briefing only scratches the surface of the historical analysis required by *Bruen*).

## 2.      Standard of review

If reviewable, the standard of review would normally be plain error: whether (1) there was error, (2) it was plain, (3) it affected Mr. Alston' substantial rights, and (4) not correcting it seriously affects the fairness, integrity, or public reputation of judicial proceedings.   *United States v. Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012).

However, whether the Second Amendment invalidates 18 U.S.C. §922(g)(1) as to Mr. Alston is a pure question of law.   The facts of his prior convictions, and his possession of the handguns in Counts 4 and 5 are not disputed.   In this situation, *de novo* review is appropriate on the first two prongs of the plain-error test:   whether there was error, and whether it was plain.   Because the government will have the opportunity to fully brief these questions, as indeed it is doing in other cases, it will not be prejudiced by this Court's application of *de novo* review to the question of §922(g)(1)'s validity after *Bruen.   See also United States v. Evans-Martinez*, 611 F.3d 635, 642 (9th Cir. 2010); *United States v. Torres*, 828 F.3d 1113, 1123 (9th Cir. 2016).

## 3.      Mr. Alston is one of "the people" with a right to arms under the Second Amendment, notwithstanding that his prior convictions are for what were nominally capital offenses in the founding era, and §922(g)(1) directly strips him of his right to arms.

The first question under *Bruen* is whether "the Second Amendment's plain text covers" Mr. Alston's conduct – his possession of arms after having suffered a felony conviction – because if it does, "the Constitution presumptively protects" it in the absence of historical evidence to the contrary.   The question, then, is whether in the colonial era, his felon status means he is not one of "the people" with a seemingly "unqualified" Second Amendment right to arms.   *See Bruen*, 142

S.Ct. at 2126.

Textually, nothing in the Second Amendment puts Mr. Alston outside the class of "people" with a right to arms. In *Heller* the Supreme Court held that the phrase "the right of the people," also appearing in the text of the First, Fourth, Ninth, and Tenth Amendments, "unambiguously refers to all members of the political community," not some "unspecified subset" that might mean only *some* "people" had the enumerated rights. *Heller*, 554 U.S. at 580 (emphasis added; citation omitted). Mr. Alston, then, is one of "the people" with textually-conferred Second Amendment rights "[u]nless the meaning of the phrase…varies from provision to provision, and the Supreme Court has suggested it does not[.]" *Range*, 69 F.4th at 102.

Placing Mr. Alston within the class of "people" with Second Amendment rights may seem inconsistent at first with *Heller*'s reference to "longstanding prohibitions" on exercise of the right by felons, and the notion that the right belongs to "law-abiding, responsible citizens." It also may seem inconsistent with the suggestion in *Vongxay* that the "*virtuous* citizenry" that has Second Amendment rights does not include felons. *Vongxay*, 594 F.3d at 1118 (emphasis added). But analytically it is fully consistent with the "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans" *unless* a review of founding-era regulations affirmatively shows that legislatures validly, affirmatively chose to strip the right from a given subset – here, felons.

Mr. Alston asserts that the historical record shows they did not. Certainly, at least one current Supreme Court justice does not believe that any express regulation stripped felons of the right to arms during the founding era. *See Kanter v. Barr*, 919 F.3d 437, 451-453 (7th Cir. 2019) (declaring that "Founding-era legislatures did not strip felons of the right to bear arms simply because of their

37

status as felons," and that felons "were not categorically excluded from our national community.") (Barrett, J., dissenting). Other reviewers have similarly found no evidence of either presumptive or longstanding (to the founding era) *textual* prohibitions on possession of arms by felons. Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harvard J. Law & Pub. Pol'y 695, 723-726 (Spring 2009).

Limiting Second Amendment rights to "virtuous" citizens does not withstand scrutiny under *Bruen*. First, the source of this principle does not rely on founding-era (or any other era's) regulations, but on something of an echo-chamber concept. The first of the two sources *Vongxay* cites does not reference regulations in support of the "virtuous-citizen" principle – only "classical republican philosophy," hazarding that with laws disarming felons were "[o]ne *implication*" of this world view. *See* Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 J. Law & Contemp. Probs. 143, 146 (1986) (emphasis added). The second reference takes this "implication" and doubles down into the declaration that "felons…were excluded from the right to arms" because they were also excluded from voting. But it cites no founding-era source linking the two. Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L.Rev. 461, 480 (1995). This does not satisfy *Bruen's* demand that the government point to a founding-era analogue *regulation*, not just a theory. *See Bruen*, 142 S. Ct. at 2126 ("historical tradition of firearm regulation"); *and* 2130, 2131-32, 2135, 2138-56. In any event, as Justice Barrett found, there is none. Multiple state constitutions did *not* link the rights to vote and the right to arms – they disenfranchised those with criminal convictions, but did not disarm them. *Kanter*, 919 F.3d at 455, citing Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208-10 (2006).

Justice Barrett has suggested that distinguishing the two, rather than linking them, makes sense – that disenfranchisement and disarming laws each burden different kinds of rights. The franchise is a civic right requiring "'citizens to act in a collective manner for distinctly public purposes.'" *Kanter*, 919 F.3d at 462, quoting Saul Cornell, A New Paradigm for the Second Amendment, 22 Law & Hist. Rev. 161, 165 (2004) ((Barrett, J., dissenting). A legislature's judgment that felon status implies a lack of fitness to vote responsibly could justify stripping the individual from participating in that collective activity. But this kind of unfitness would not justify a complete ban on a felon's possession of arms in exercise of the right to "individual self-defense [that] is 'the *central component*' of the Second Amendment right,'" *see Bruen*, 142 S.Ct. at 2133 (quotation omitted; emphasis in original). No founding-era legislature did so. This distinction has borne on at least one district court's ruling dismissing a §922(g)(1) count before trial. *United States v. Bullock*, 2023 WL 4232309, *-- (S.D. Mississippi, June 28, 2023).

*Range* was thus correct when it held that the plain-text phrase "the people," and the historical underpinnings of the amendment's passage, includes all members of the "national community," even those with convictions for crimes punishable by more than a year in prison. *See Range*, 69 F.4th at 101. This Court should so hold here.

Lastly, on "the easy question" of the nature of the restriction, §922(g)(1) interferes with Mr. Alston' presumptively-protected right to arms in the most drastic way possible – through a lifetime ban on his possessing them for any purpose, including self-defense. *Range*, 69 F.4th at 102-103. Thus Mr. Alston satisfies the first step of the *Bruen* test – he is one of "the people" with a Second Amendment right to arms, and §9221(g)(1) prohibits his direct exercise of his right.

39

**4.    The government cannot meet its burden of showing "how" a historical-analogue regulation operated in a "relevantly similar" manner to §922(g)(1), consistent with this country's historical tradition of arms regulation.**

The second step under *Bruen* is whether the government can place §922(g)(1), consistent with founding-era historical tradition, alongside a "well-established and representative historical analogue" that would put it within this country's tradition of arms regulation.   A "historical twin" is not necessary, but the government must show a founding-era disarming regulation that is "relevantly similar."   For the old analogue and the challenged regulation to be "relevantly similar," this Court must measure their closeness to each other in at least "at least two metrics:   *how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense."   *Bruen*, 142 S.Ct. at 2132-2133 (emphasis added.

The "how" here is, again, simple and dire – §922(g)(1) imposes a lifetime ban on Mr. Alston's right to arms for self- and home-defense because of his felon status.   Its predecessor is a 20th-century product, a 1938 federal law that limited this loss to those convicted of "murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year."   *Range*, 65 F.4th at 104-105; *see* Federal Firearms Act, §§1(6), 2(e), 52 Stat. 1251 (June 30, 1938).   A 1961 amendment expanded this list to cover all crimes "punishable by imprisonment exceeding one year."   Pub. L. 87-342, An Act to strengthen the Federal Firearms Act, §2, 75 Stat. 757 (Oct. 3, 1961).

Nearly 40 years before *Heller*, with no individual Second Amendment-right issue in view, this Court upheld §922(g)(1) against a due process challenge that it irrationally classified the defendant, a non-violent felon, by restricting him from

40

having a gun.   This Court answered that §922(g)(1) was rationally related to carrying out "an anti-crime legislative program" that would "make it more difficult for the criminal elements of our society to obtain firearms."   *United States v. Thoresen*, 428 F.2d 654, 659 (9th Cir. 1970), *citing* S. 1750, S. Rep. 364 at 2, June 12, 1961.   The elements meant were "organized crime.   107 Cong. Rec. H20248 (daily ed. Sept. 19, 1961) (statement of Rep. Mills).   But the 1961 law almost certainly "falls well short of 'long-standing'" for Second Amendment purposes. *Range*, 65 F.4th at 104.   Also, in general, as 20th-century laws, neither the 1938 nor the 1961 regulations offer "insight into the meaning of the Second Amendment when it contradicts earlier evidence."   *Bruen*, 142 S.Ct. at 2154, n. 28.   Here the contradiction is especially sharp – a complete historical *absence* of founding-era laws stripping felons of their right to arms.

However, beyond being too late, §922(g)(1) also does not pass muster under the relevant-similarity requirement.   Neither the 1938 nor the 1961 version of the felon-arms restriction is "relevantly similar" to founding-era disarmament laws in how it operates.   Founding-era colonists, felons or not, needed arms for daily living – self-defense against people, protection from wildlife, obtaining food. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons From Possessing Arms*, 20 Wyo. L. Rev. 249, 263-264 (2020).   The disarming regulations that did exist fell into two categories, none of them "relevantly similar" to §922(g)(1) either in who they disarmed, or for how long.

First, during the colonial era, dissidents could be disarmed as part of punishment for sedition, often based on religion.   However, it is unclear that these laws operated to *permanently* disarm.   At least one prominent 17th-century example reports how banished religious dissidents got their guns back on returning to the community.   Greenlee, 20 Wyo. L. Rev. at 263-264.   Over a century later

41

in 1776, at the time this country was founded, the Continental Congress similarly recommended disarming people "disaffected" toward the new order, including but not limited to people unwilling to swear an oath of allegiance, or affirmatively loyal to England.   Six colonies did so.   *Id*. at 263; Frassetto, *Firearms and Weapons Legislation Up To the Early 20th Century* at 83-84, https://ssrn.com/abstract= 220091 (last visited August 11, 2023).

The second and third categories of regulations involved individuals who were excluded from the benefits of the Bill of Rights in the founding era.   The second category arose from the "tension, suspicion, and confrontation" in colonists' relationship with Native Americans.   Rather than prohibiting arms possession, or punishing the possessors for acquiring arms, founding-era laws criminalized arms and ammunition trades with them.   This was not entirely successful, as other European traders could and did fill the need.   Spitzer, *Gun Law History in the United States and the Second Amendment*, 80 J. Law & Contemporary Problems 55, 57-58 (2017).   The third category consists of a "relatively small number of written state restrictions" prohibiting Black Americans living in slavery from having arms, unless their enslavers chose to arm them; and sometimes also prohibiting arms possession by the un-enslaved.   Only the source of the tension here was different – the "overriding fear" that if these individuals were armed, they might upend the slave economy.   *Id*. at 78-79; *see also* Frassetto, *Firearms and Weapons Legislation Up To the Early 20th Century* at 83-87, https://ssrn.com/abstract= 220091.   Still, because these groups did not enjoy the right to arms, laws about them shed no light on the scope of the Second Amendment right for those who did, yet had suffered a criminal conviction.   *See Rahimi*, 61 F.4th at 456-457.

In sum, §922(g)(1) is not "relevantly similar" to founding-era disarming laws in "how" it operates. No founding-era disarming law had such a temporally expansive reach.

> **5.      The government will not be able to demonstrate a historical-analogue regulation, or a historical tradition of arms regulation, equating felon status with dangerousness leading to lifetime disarmament.**

In defending §922(g)(1), the government has argued that felons stood outside the group with a right to arms because their crimes carried capital punishment as a penalty. *Range*, 69 F.4th at 102. This echoes the *Vongxay* reference to the right as perhaps belonging only to the "virtuous citizenry," 594 F.3d at 1118, not felons. But it gets to the heart of the question *Bruen* asks: whether "why" §922(g)(1) was enacted is relevantly similar to "why" founding-era disarmament laws existed.

The analogues for disarmament in the colonial and founding eras reflect a tradition in which "the justification [for disarming groups] was always that those being disarmed were dangerous." Greenlee, 20 Wyo. L. Rev. at 265. The Eighth Circuit recently relied on this premise in upholding §922(g)(1) against a *Bruen*-based motion to dismiss, finding a historical tradition in the founding-era laws that "prohibited" Native Americans or religious dissidents from possessing arms. *See United States v. Jackson*, 69 F.4th 495, 502-503 (8th Cir. 2023), Bellesiles, *Gun Laws in Early America: The Regulation of Gun Ownership 1607-1794*, 16 Law & Hist. Rev. 567, 577-579 (Fall 1998). Actually, again, these laws punished colonists for carrying on arms *trades*, rather than punishing Native American arms possessors.

*Jackson* nonetheless held that this and the religious-dissident disarmament showed "Congress acted within the [U.S.] historical tradition when it enacted §922(g)(1)[.]" *Id.* Its reasoning, however, relied on an earlier *Range* panel opinion, which the *en banc* decision replaced, holding that colonial- and founding-era disarmament of Black Americans, Native Americans, and dissidents "does nothing to prove" that a felon, at least one who is non-violent, is "part of a similar group." *Compare Jackson*, 69 F.4th at 503-504 *to Range*, 69 F.4th at 105.

Still, in one sense, the Eighth Circuit offered an important insight into the "why" of founding-era disarming laws – that confiscating the guns of "dangerous" classes, however defined, was the common thread in founding-era arms regulations. "Danger" could describe the dissident thought of religious minorities or Loyalists, or direct, individual physical violence. *Jackson*, 69 F.4th at 502 Either would be anathema to the "law-abiding, responsible" citizen class – which brings up the "why" issue here: whether 922(g)(1)'s application to Mr. Alston, whose conviction is premised on his Washington convictions for residential burglary (4-ER-602-603), is consistent with any "historical tradition that delimits the outer bounds" of a person's Second Amendment rights based on notions of dangerousness. *Bruen*, 142 S.Ct. at 2127. He submits that there is no historical tradition putting him beyond these outer bounds based on his burglary convictions.

The government may argue that during the founding "felons were routinely executed or stripped of all rights" and so conviction itself carried the consequence of disarmament. *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). It might analogize Mr. Alston, convicted of burglary, to this group. Burglary was indeed a capital crime under English law that colonists brought with them, but "the American picture is far more complex" as to how it was treated, with "variations on punishment" that included a more limited use of the death penalty, and re-

44

classification of crimes as non-capital.   *Id.*   For example, the 1718 Pennsylvania criminal code adopted English "laws…as to felonies," with burglary listed among others as a capital crime.   Historical notations indicated that during the colonial period many crimes were added to the "list, already too large," and all were "capital at the revolution."   However, "the severity of our criminal laws is an exotic plant, and not the growth of our native Pennsylvania," and "has never been a favourite."   https://www.palrb.gov/Preservation/Smith-Laws/View-Document/17001799/1718/0/act/0236.pdf at 1-2 (last visited Aug. 11, 2023)   By 1780, robbery and burglary were punished "by the forfeiture of real and personal estate, and imprisonment at hard labour, instead of death."   The governor had authority to "remit fines and forfeitures, and grant reprieves and pardons." https://www.palrb.gov/Preservation/Smith-Laws/View-Document/17001799/1780/0/act/0878.pdf (last visited Aug. 11, 2023.

It is true that forfeiture laws following non-capital felony convictions included the surrender of goods, which would have included arms.   Critically, however, they did not preclude the *reacquisition* of arms after service of a criminal sentence, as they did not say that "one could not thereafter purchase and hold new personal property – including a gun."   Marshall, 32 Harvard J. Law & Pub. Pol'y at 715.   In *Range*, 69 F.4th at 105, the Third Circuit noted that the government did not cite a single statute or case that restricted such reacquisitions.

In addition to the evidence reflecting that founding-era legislatures did not uniformly, permanently disarm felons (including burglars) by execution, or criminalize their reacquisition of arms, it is proper to note that in modern times, burglary is not necessarily a badge of dangerousness, either.   For example, Washington burglary is not a crime of violence for modern sentencing guidelines or statutory enhancement purposes.   *See United States v. Wenner*, 351 F.3d 959,

45

972-974 (9th Cir. 2003), U.S.S.G. §4B1.2(a)(2).    This is because burglary in Washington is more expansive than the founding-era capital, or serious non-capital, crime – "the scope of Washington's residential burglary statute exceeds the federal definition" because it reaches any "dwelling other than a vehicle."    Under Washington law, a "dwelling" can include a home's "fenced area," even if the defendant does not enter the home itself, and remains in the backyard.    *State v. Wentz*, 68 P.3d 282, 285-286) (Wash. 2003).    Whether this renders Mr. Alston so dangerous that the founding era authorities would have treated his crime as worthy of lifetime disarmament is doubtful.    Applying §922(g)(1) to deprive him of his right to arms possession for his own self- and home-defense is not "rooted in this country's historical tradition of arms regulation.    His convictions on Counts 4 and 5 must be reversed.

## VI.    CONCLUSION

For the above reasons, Mr. Alston's conviction on Count 3 should be reversed and remanded for a new trial.    His convictions on Counts 4 and 5 should be vacated and those counts dismissed.

Dated:   August 23, 2023               _____*/s/ Myra Sun*_____
                                        MYRA SUN
                                        Attorney for Appellant

# CERTIFICATE OF COMPLIANCE

### (United States Court of Appeals for the Ninth Circuit – Form 8)

**9th Cir. Case Number(s)** _____23-30035_____

I am the attorney for Appellant ___Kendall Alston___

**This brief contains** _____10,050_____**words,** excluding the items exempted by Fed. R. App. P. 32(f).The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P.29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　　[  ] it is a joint brief submitted by separately represented parties;

　　[  ] a party or parties are filing a single brief in response to multiple briefs; or

　　[  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**___ */S/ Myra Sun* ___　　　**Date** _____August 23, 2023_____
*(use "*s/[typed name]*" to sign electronically-filed documents)*

47

## STATEMENT OF RELATED CASES

### (Pursuant to Circuit Rule 28-2.6)
### (United States Court of Appeals for the Ninth Circuit - Form 17)

**9th Cir. Case Number(s)** _____23-30035___

The undersigned attorney or self-represented party states the following:

I am aware of the following related cases currently pending in this court. The case number and name of each related case is below. The relationship of each case to this case is that all appellants raise the impact of *New York State Pistol & Rifle Ass'n v. Bruen* on convictions for violating 18 U.S.C. §922(g)(1).

> *United States v. Rojo*, CA No. 23-598
> *United States v. Butts*, CA No. 23-313
> *United States v. Gonzalo Ramos*, CA No. 22-50177

**Signature** _/S/ Myra Sun_____ **Date** _____August 23, 2023

*(use "*s/[typed name]*" to sign electronically-filed documents)*

48

# CERTIFICATE OF SERVICE FOR ELECTRONIC FILING

## (United States Court of Appeals for the Ninth Circuit – Form 15)

**9th Cir. Case Number(s)**___23-30035_____

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

[   ] I certify that I served the foregoing/attached document(s)via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

[   ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants*(list each name and mailing/email address)*:

N/A

**Description of Document(s)***(required for all documents)***:**

Appellant's Opening Brief; Excerpts of Record Vols. 1-4

**Signature**____*/S/ Myra Sun*_____     **Date** _____August 23, 2023_____
*(use* "s/[typed name]" *to sign electronically-filed documents)*