No. 23-30035
[NO. 2:22-cr-00066-LK, USDC, W.D. Washington]

_____

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

KENDALL ALSTON,

Defendant-Appellant.

_____

**ANSWERING BRIEF OF UNITED STATES**

_____

Appeal from the United States District Court
for the Western District of Washington at Seattle
The Honorable Lauren King
United States District Judge

_____

TESSA M. GORMAN
Acting United States Attorney
Western District of Washington

JONAS LERMAN
Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Telephone: 206-553-7970

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................v

INTRODUCTION ...............................................................................1

ISSUES PRESENTED .........................................................................1

I.      On Count 3, did the district court plainly err or abuse its discretion when instructing the jury on the elements of 18 U.S.C. § 924(c)(1)(A)(i) without defining "in furtherance of," where precedent makes clear that no definition is required?.........1

II.     On Counts 4 and 5, did Alston waive his Second Amendment challenge to 18 U.S.C. § 922(g)(1) by failing to assert it before trial? If not, does the statute violate the Second Amendment as applied to Alston on plain-error review?...............1

JURISDICTION, TIMELINESS, AND BAIL STATUS ..........................1

STATEMENT OF THE CASE ...............................................................2

I.      Alston's long and violent criminal history......................................2

II.     Alston's present crimes ................................................................3

        A.      Alston commits a theft while carrying a revolver .................3

        B.      Alston deals fentanyl while carrying a pistol .........................4

III.    Pretrial .......................................................................................4

        A.      Charges and pretrial detention .............................................4

        B.      Proposed jury instructions on Count 3 ...................................5

IV. Trial ...................................................................................... 7

    A. Preliminary jury instructions, opening statements, and evidence ...................................................... 7

    B. Closing arguments ................................................................ 8

    C. Final jury instructions .......................................................... 8

    D. Guilty verdicts on Counts 1 through 3 ................................. 9

    E. Guilty pleas on Counts 4 and 5 ........................................ 10

V. Sentencing ......................................................................... 11

SUMMARY OF ARGUMENT ................................................... 12

ARGUMENT ............................................................................. 13

I. The district court did not plainly err or abuse its discretion in formulating the 18 U.S.C. § 924(c) jury instructions ...................................................................... 13

    A. Standard of review .............................................................. 13

    B. The district court acted well within its discretion by not defining "in furtherance of" for the jury ................... 14

    C. The alleged instructional error also did not prejudice Alston ....................................................... 19

II. Alston's as-applied Second Amendment challenge to 18 U.S.C. § 922(g)(1) is waived and meritless ................................. 24

    A. Alston waived this claim by not raising it pretrial ............. 24

    B. Standard of review on the merits ....................................... 26

C.  Under binding Ninth Circuit precedent, section
    922(g)(1) is constitutional .................................................... 29

    1.  The Supreme Court held in *Heller* that the
        Second Amendment protects an individual
        right of law-abiding citizens ........................................ 29

    2.  After *Heller*, this Court upheld section
        922(g)(1) based on the Second Amendment's
        text and history ............................................................ 30

    3.  Ninth Circuit precedent remains
        controlling, and its history-based analysis is
        reaffirmed—not overruled—by *Bruen* ......................... 32

D.  Ninth Circuit precedent aside, section 922(g)(1) is
    constitutional as applied to Alston ...................................... 39

    1.  Supreme Court precedent recognizes that
        Congress may disarm felons ........................................ 40

    2.  Text, history, and tradition confirm that
        Congress may disarm felons ........................................ 41

        a.  Felons are not among "the people"
            protected by the Second Amendment ................. 41

        b.  The right to bear arms has historically
            been understood to extend only to law-
            abiding persons .................................................... 46

        c.  The Second Amendment has
            historically been understood to protect
            only responsible individuals—and
            felons are categorically irresponsible ................ 51

d.    Alston may not obtain an as-applied exemption from section 922(g)(1) based on the nature of his crimes .......................57

E.    Alston cannot satisfy plain error's requirements ................64

1.    There was no error ......................................................65

2.    The alleged error was not plain .................................65

3.    Alston's substantial rights are unaffected .................68

4.    The alleged error does not seriously affect the fairness, integrity, or public reputation of judicial proceedings ................................................71

CONCLUSION ........................................................................72

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

iv

# TABLE OF AUTHORITIES

## Federal Cases

*Austin v. United States,*
    509 U.S. 602 (1993) ................................................................. 48

*Avilez v. Garland,*
    69 F.4th 525 (9th Cir. 2023) ................................................. 37

*Barrett v. United States,*
    423 U.S. 212 (1976) ......................................................... 55, 56

*Binderup v. Att'y General,*
    836 F.3d 336 (3d Cir. 2016) ................................................. 55

*Blanton v. City of N. Las Vegas,*
    489 U.S. 538 (1989) ............................................................... 58

*Branzburg v. Hayes,*
    408 U.S. 665 (1972) ............................................................... 58

*Bucklew v. Precythe,*
    139 S. Ct. 1112 (2019) .......................................................... 47

*Calero-Toledo v. Pearson Yacht Leasing Co.,*
    416 U.S. 663 (1974) ............................................................... 48

*Dickerson v. New Banner Inst., Inc.,*
    460 U.S. 103 (1983) ............................................................... 55

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ..................................................... passim

*Folajtar v. Att'y General,*
    980 F.3d 897 (3d Cir. 2020) ................................................. 50

*Hamilton v. Pallozzi*,
848 F.3d 614 (4th Cir. 2017) ................................................................. 63

*Hatfield v. Barr*,
925 F.3d 950 (7th Cir. 2019) ......................................................... 27, 68

*Kanter v. Barr*,
919 F.3d 437 (7th Cir. 2019) ................................................. 36, 44, 69

*Lewis v. United States*,
445 U.S. 55 (1980) ............................................................................... 55

*Lewis v. United States*,
518 U.S. 322 (1996) ............................................................................. 58

*Logan v. United States*,
552 U.S. 23 (2007) ............................................................................... 61

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ...................................................................... 30, 59

*Medina v. Whitaker*,
913 F.3d 152 (D.C. Cir. 2019) ........................................... 47, 51, 54, 59

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) ........................................................ 36, 38

*Neder v. United States*,
527 U.S. 1 (1999) ................................................................................. 19

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
597 U.S. 1 (2022) ........................................................................ passim

*Pontarelli v. U.S. Dep't of the Treasury*,
285 F.3d 216 (3d Cir. 2002) (en banc) ............................................... 61

*Puckett v. United States*,
556 U.S. 129 (2009) .................................................................. 64, 65, 71

*Range v. Attorney General,*
  69 F.4th 96 (3d Cir. 2023) (en banc) .................................. 25, 55, 57, 67

*Richardson v. Ramirez,*
  418 U.S. 24 (1974) ........................................................ 43, 44

*Sanchez v. Mayorkas,*
  141 S. Ct. 1809 (2021) ........................................................ 36

*Smith v. Marsh,*
  194 F.3d 1045 (9th Cir. 1999) ................................................ 14

*Smith v. United States,*
  508 U.S. 223 (1993) ........................................................... 69

*Spencer v. Kemna,*
  523 U.S. 1 (1998) ............................................................. 44

*Tingley v. Ferguson,*
  47 F.4th 1055 (9th Cir. 2022) ................................................ 36

*United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.,*
  971 F.2d 244 (9th Cir. 1992) ................................................. 51

*United States v. Alaniz,*
  69 F.4th 1124 (9th Cir. 2023) ........................................ 65, 66, 69

*United States v. Avila,*
  No. 22-50088, 2022 WL 17832287 (5th Cir. Dec. 21, 2022)
  (per curiam) ................................................................. 67

*United States v. Brown,*
  2023 WL 4826846 (D. Utah July 27, 2023) ................................... 53

*United States v. Cabrera,*
  83 F.4th 729 (9th Cir. 2023) ................................................ 13

*United States v. Castillo,*
   69 F.4th 648 (9th Cir. 2023) ............................................................... 27

*United States v. Chi Mak,*
   683 F.3d 1126 (9th Cir. 2012) ............................................................ 26

*United States v. Chovan,*
   735 F.3d 1127 (9th Cir. 2013) ............................................................ 32

*United States v. Christensen,*
   828 F.3d 763 (9th Cir. 2015) .............................................................. 65

*United States v. Classic,*
   313 U.S. 299 (1941) ........................................................................... 44

*United States v. Cunningham,*
   70 F.4th 502 (8th Cir. 2023) ............................................................... 66

*United States v. Cunningham,*
   No. 22-1080, 2023 WL 5606171 (8th Cir. Aug. 30, 2023) ................. 66

*United States v. Duarte,*
   No. 22-50048 (argued 9th Circuit Dec. 4, 2023) ................................ 51

*United States v. Evans-Martinez,*
   611 F.3d 635 (9th Cir. 2010) .............................................................. 27

*United States v. Gilbert,*
   813 F.2d 1523 (9th Cir. 1987) ............................................................ 24

*United States v. Gonzalez Becerra,*
   784 F.3d 514 (9th Cir. 2015) .............................................................. 65

*United States v. Gonzalez-Aguilar,*
   718 F.3d 1185 (9th Cir. 2013) ............................................................ 68

*United States v. Guerrero,*
  921 F.3d 895 (9th Cir. 2019) (per curiam)............................................24

*United States v. Herron,*
  45 F.3d 340 (9th Cir. 1995)....................................................................62

*United States v. Hicks,*
  217 F.3d 1038 (9th Cir. 2000)................................................................14

*United States v. Hindman,*
  2023 WL 8020699 (W.D. Wash. Nov. 20, 2023) ............................38, 39

*United States v. Hofus,*
  598 F.3d 1171 (9th Cir. 2010).................................................................15

*United States v. Howard,*
  No. 22-10211, Dkt. 33 (9th Cir.) ............................................................51

*United States v. Irons,*
  31 F.4th 702 (9th Cir. 2022) ........................................................ passim

*United States v. Jackson,*
  69 F.4th 495 (8th Cir. 2023) ............................................53, 54, 55, 66

*United States v. Jackson,*
  85 F.4th 468 (8th Cir. 2023) .................................................................66

*United States v. Jackson,*
  656 F. Supp. 3d 1239 (W.D. Wash. 2023).............................................38

*United States v. Jarnig,*
  860 F. App'x 471 (9th Cir. 2021)....................................................62, 63

*United States v. Kessi,*
  868 F.2d 1097 (9th Cir. 1989).................................................................14

*United States v. Krouse,*
  370 F.3d 965 (9th Cir. 2004).................................................................22

*United States v. Lonich,*
 23 F.4th 881 (9th Cir. 2022) ............................................................ 19

*United States v. Lopez,*
 477 F.3d 1110 (9th Cir. 2007) .................................................. passim

*United States v. Loucks,*
 149 F.3d 1048 (9th Cir. 1998) ......................................................... 62

*United States v. Mahan,*
 586 F.3d 1185 (9th Cir. 2009) ......................................................... 21

*United States v. Marcus,*
 560 U.S. 258 (2010) ......................................................................... 14

*United States v. Matus-Zayas,*
 655 F.3d 1092 (9th Cir. 2011) ......................................................... 26

*United States v. Miles,*
 86 F.4th 734 (7th Cir. 2023) ........................................................... 67

*United States v. Montero-Camargo,*
 208 F.3d 1122 (9th Cir. 2000) (en banc) ......................................... 39

*United States v. Palmer,*
 183 F.3d 1014 (9th Cir. 1999) ......................................................... 62

*United States v. Peeples,*
 630 F.3d 1136 (9th Cir. 2010) ......................................................... 27

*United States v. Phillips,*
 827 F.3d 1171 (9th Cir. 2016) ............................................. 32, 38, 39

*United States v. Racliff,*
 No. 22-10409, 2023 WL 5972049 (5th Cir. Sept. 14, 2023)
  (per curiam) .................................................................................... 67

*United States v. Rahimi,*
    61 F.4th 443 (5th Cir. 2023) ...................................................... 25, 26

*United States v. Rhodes,*
    713 F.2d 463 (9th Cir. 1983) ............................................................ 19

*United States v. Rodriguez,*
    971 F.3d 1005 (9th Cir. 2020) .......................................................... 14

*United States v. Roy,*
    No. 22-10677, 2023 WL 3073266 (5th Cir. Apr. 25, 2023)
    (per curiam) .................................................................................... 67

*United States v. Saini,*
    23 F.4th 1155 (9th Cir. 2022) .......................................................... 17

*United States v. Seuss,*
    474 F.2d 385 (1st Cir. 1973) ............................................................ 24

*United States v. Singh,*
    979 F.3d 697 (9th Cir. 2020) ...................................................... 19, 71

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010) (en banc) ............................................ 52

*United States v. Soulard,*
    730 F.2d 1292 (9th Cir. 1984) .......................................................... 15

*United States v. Sullivan,*
    No. 22-30034, 2023 WL 2064565 (9th Cir. Feb. 17, 2023) ................ 63

*United States v. Torres,*
    828 F.3d 1113 (9th Cir. 2016) .......................................................... 27

*United States v. Tuan Ngoc Luong,*
    965 F.3d 973 (9th Cir. 2020) ............................................................ 17

*United States v. Verdugo-Urquidez,*
  494 U.S. 259 (1990)................................................................45

*United States v. Vongxay,*
  594 F.3d 1111 (9th Cir. 2010)..................................... passim

*United States v. Yijun Zhou,*
  838 F.3d 1007 (9th Cir. 2016)......................................27, 28

*Van Der Hule v. Holder,*
  759 F.3d 1043 (9th Cir. 2014)............................................32

*Vincent v. Garland,*
  80 F.4th 1197 (10th Cir. 2023) ..........................................67

*Voisine v. United States,*
  579 U.S. 688 (2016)............................................................43

*Young v. Hawaii,*
  992 F.3d 765 (9th Cir. 2021) (en banc),
  *vacated and remanded,* 142 S. Ct. 2895 (2022)............25, 27

**State Cases**

*Avery v. Everett,*
  18 N.E. 148 (N.Y. 1888) ..............................................47, 48

*In re Deming,*
  10 Johns. 232 (N.Y. 1813) (per curiam)............................48

**Federal Statutes**

Title 18, UNITED STATES CODE,
  Section 921(a)(20) ............................................................62
  Section 922(g)(1) ....................................................... passim
  Section 922(g)(8) ........................................................26, 74
  Section 922(g)(9) ..............................................................32
  Section 924(c) ........................................... 6, 13, 18, 69
  Section 924(c)(1)(A)(i) ....................................1, 5, 12, 15

Title 18, UNITED STATES CODE, (continued)

    Section 925(c) ........................................................................ 61

    Section 3231 ............................................................................ 1

Title 28, UNITED STATES CODE,

    Section 1291 ............................................................................ 1

UNITED STATES CONSTITUTION,

    Amendment II .......................................................................... 41

    Amendment V .......................................................................... 58

    Amendment X .......................................................................... 46

    Amendment XIV, Section 2 ...................................................... 43

    Amendment XVII, Clause 1 ................................................ 44, 46

    Amendment XVII, Clause 2 ...................................................... 46

    Article I, Section 2, Clause 1 .............................................. 44, 46

## State Statutes

REVISED CODE OF WASHINGTON,

    Section 9.96.010–9.96.080 ...................................................... 62

## Federal Congressional Reports

H.R. Rep. No. 183, 104th Cong., 1st Sess. 15 (1996) .............................. 61

S. Rep. No. 353, 102d Cong. 2d Sess. 19, 20 (1992) ............................... 61

## Federal Rules

Federal Rule of Criminal Procedure

    Rule 12(b)(3) .......................................................................... 24

    Rule 12(b)(3)(B)(v) ................................................................. 24

    Rule 12(c) ............................................................................... 24

    Rule 30(d) ............................................................................... 14

## Other Authorities

2 *The Documentary History of the Ratification of the Constitution* 598,

    (Merrill Jensen ed., 1976) ...................................................... 50

3 Jac. 1, Chapter 5,
  Section 16 (1605) (Eng.)....................................................................49

3 Joseph Story, *Commentaries on the Constitution of the United States*,
  Section 1890 (1833)...........................................................................42

4 William Blackstone, *Commentaries on the Laws of
  England* 98 (1769)............................................................ 46, 47, 48, 49

Act for the Punishing of Criminal Offenders,
  1692 Mass. Acts & Laws 11-12........................................................54

Act for the Punishing of Criminal Offenders,
  1696-1701 N.H. Laws 15 ..................................................................54

Act for the Punishing of Criminal Offenders, 1692 Mass. Acts & Laws
  no. 6, pp. 11–12; An Act for the Punishing of Criminal Offenders,
  1771 N.H. Acts and Laws ch. 6, § 5, p. 17);
  Duke University School of Law, Center for Firearms Law, *Repository
  of Historical Gun Laws*,
  https://firearmslaw.duke.edu/repository/search-the-repository. ........54

Akhil Reed Amar, *The Bill of Rights: Creation and
  Reconstruction* 48 (1998)..................................................................43

Beth A. Colgan, *Reviving the Excessive Fines Clause*,
  102 Cal. L. Rev. 277 (2014)..........................................................47, 48

David Thomas Koning, *"Dale's Laws" and the on-Common Law Origins
  of Criminal Justice in Virginia*,
  25 Am. J. Legal Hist. 354 (1982) .....................................................49

Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution:
  The English Origin of the Right to Keep and Bear Arms*,
  95 Notre Dame L. Rev. 397 (2019) ...................................................53

Dru Stevenson, *In Defense of Felon-in-Possession Laws*,
  43 Cardozo L. Rev. 1573 (2022)...................................................50, 51

Ninth Circuit Model Jury Instructions,
    iv (2022 ed.) ................................................................... 14, 17
    v (2022 ed.) ........................................................................ 17
    14.23 ..................................................................................... 5
    14.23 (rev. March 2023) .............................................. 13, 16, 17, 18

*Joseph G.S. Greenlee, The Historical Justification for Prohibiting*
    *Dangerous Persons from Possessing Firearms,*
    20 Wyo. L. Rev. 249 (2020) .................................................... 53

Militia Act 1662, 17 & 14 Car. 2,
    Chapter 3, Section 13 .............................................................. 53

The Federalist No. 74 (Alexander Hamilton),
    Jacob E. Cooke ed. 1961) ........................................................ 60

*The Popular Sources of Political Authority: Documents on the*
    *Massachusetts Constitution of 1780*
    (Oscar Handlin & Mary Handlin eds. 1966) ........................... 50

*The Public Records of the Colony of Connecticut From May, 1775 to*
    *June, 1776*, (Charles J. Hoadly ed., 1890) ............................. 49

Thomas M. Cooley, A Treatise on the Constitutional Limitations
    Which Rest Upon the Legislative Power of the States of the
    American Union 28-29 (1st ed. 1868) ...................................... 53

## INTRODUCTION

Police caught Kendall Alston dealing fentanyl while carrying a pistol. Police also caught him committing a theft while carrying a revolver. At trial, a jury convicted Alston of drug-trafficking crimes and of possessing a firearm in furtherance of those crimes. And he pleaded guilty midtrial to two counts of possessing firearms as a felon. He now challenges his three firearm convictions. His claims lack merit.

## ISSUES PRESENTED

I.   On Count 3, did the district court plainly err or abuse its discretion when instructing the jury on the elements of 18 U.S.C. § 924(c)(1)(A)(i) without defining "in furtherance of," where precedent makes clear that no definition is required?

II.  On Counts 4 and 5, did Alston waive his Second Amendment challenge to 18 U.S.C. § 922(g)(1) by failing to assert it before trial? If not, does the statute violate the Second Amendment as applied to Alston on plain-error review?

## JURISDICTION, TIMELINESS, AND BAIL STATUS

The district court had jurisdiction under 18 U.S.C. § 3231 and entered judgment in February 2023. 1-ER-2. Alston timely noticed his appeal the next day. 4-ER-606–07. This Court's jurisdiction rests on 28 U.S.C. § 1291. Alston is serving his prison sentence, with a projected release date of July 28, 2026.

## STATEMENT OF THE CASE

### I.   Alston's long and violent criminal history

Between 2005 and 2018, Alston earned more than 20 state convictions for crimes ranging from residential burglary to domestic-violence offenses. PSR ¶¶ 38–54. He is in criminal history category VI—the highest. PSR ¶ 56; SER-50.

In one case, Alston forced his way into the home of R., his then-girlfriend. PSR ¶ 44. He hit her in the head and face, and he grabbed her by the throat while she held the couple's baby. *Id.* She feared for her life and asked Alston, "Are you going to kill me in front of your daughter?" *Id.* Altson was convicted of domestic-violence criminal trespass and domestic-violence assault and sentenced to 105 days in custody, plus domestic-violence treatment. *Id.*

Alston's abuse of R. continued. PSR ¶ 49. According to R., Alston hit the couple's daughter when she was 9 months old and gave her a concussion; stalked R.; and said that he would kill R. the next time he saw her. *Id.* She also told police that she had seen Alston with a gun and feared that he would carry out his threat to kill her. *Id.* Alston was convicted of felony harassment and of violating a domestic-violence protection order, and he received a 17-month sentence. *Id.*

In one of his burglary cases, Alston broke into a victim's house and searched for valuables while armed with a knife. PSR ¶ 48. Police caught him leaving with a bag of stolen goods. *Id.* A state court sentenced him to more than three years in prison. *Id.*

In another burglary case (PSR ¶ 52), Alston was sentenced to more than five years in prison. A few years later, in 2017, he was sentenced to more than three years in prison for residential burglary, malicious mischief, theft, and obstruction. PSR ¶ 54; SER-70–71. In other cases, Alston assaulted a bus driver (PSR ¶ 43) and assaulted a victim "with sexual motivation" (PSR ¶ 40), among other crimes.

When convicted here, Alston faced state charges for assault and other crimes stemming from his abuse of a girlfriend. PSR ¶¶ 58–59.

## II. Alston's present crimes

### A. *Alston commits a theft while carrying a revolver*

In January 2022, Alston stole more than $1,600 worth of designer clothes from a department store—a "felony theft." SER-22; PSR ¶ 9. Soon after Alston fled the store, police caught him carrying the clothes and a loaded .38-caliber revolver. PSR ¶ 9; 4-ER-579–83. As a felon, Alston may not possess firearms. 18 U.S.C. § 922(g)(1).

3

### B. *Alston deals fentanyl while carrying a pistol*

Two months later, in March 2022, police spotted Alston conducting hand-to-hand drug deals in Seattle, on a street known for drug trafficking. PSR ¶¶ 7–8; 2-ER-64–74; 3-ER-152–77, 249–68, 379–82. The area is an "open-air drug market." 3-ER-251, 295–96.

A search incident to Alston's arrest turned up evidence including more than 240 fentanyl pills (valued at over $1,600) in a plastic bag in his right jacket pocket, cash in his pants pockets, and a pistol. PSR ¶ 8; 2-ER-72–74, 99; 3-ER-173–75, 249–68, 298–301, 381–91; 4-ER-464–65.

Alston's pistol, a .45-caliber Hi-Point, was loaded with five rounds of ammunition, including one round in the chamber. PSR ¶ 8; 2-ER-73, 77–81. This pistol is an unusually heavy and bulky model—"incredibly difficult to conceal." 4-ER-468–69; *see* 2-ER-117–18; 4-ER-422. Alston carried it in a small backpack on his right side. 2-ER-72–74, 99; 3-ER-173–75, 249–54, 298–301; 4-ER-442, 464–65.

## III. Pretrial

### A. *Charges and pretrial detention*

A grand jury in May 2022 returned a five-count indictment:

- Counts 1 and 2 charged Alston with distributing fentanyl and possessing it with intent to distribute.

4

- Count 3 charged Alston with possessing a firearm in furtherance of a drug-trafficking crime under 18 U.S.C. § 924(c)(1)(A)(i) (the pistol).

- Count 4 charged Alston with possessing a firearm as a felon under 18 U.S.C. § 922(g)(1) (the pistol).

- Count 5 charged Alston with possessing a firearm as a felon under 18 U.S.C. § 922(g)(1) (the revolver).

4-ER-601–05. Alston never moved to dismiss any counts.

At the parties' request, the district court bifurcated the trial so that the jury would decide Counts 1 through 3 before hearing evidence on Counts 4 and 5. SER-207, 217–18.

The court ordered Alston detained pending trial as a flight risk and a danger to the community. SER-221–23.

### B.    *Proposed jury instructions on Count 3*

On Count 3, which charged Alston with possessing a firearm in furtherance of a drug-trafficking crime, the parties agreed that the jury should be instructed under Ninth Circuit Model Criminal Jury Instruction 14.23. SER-122–23, 125, 214–15. At the time, that model instruction did not define "in furtherance of." SER-130–31; 1-ER-11–12, 34–35; *see United States v. Irons*, 31 F.4th 702, 707 (9th Cir. 2022).

Although Alston agreed that the district court should give that instruction (SER-130–31), he asked the court to supplement it with his

5

proposed definition of "in furtherance of":

> "In furtherance of" means to help forward, to promote, to advance or to give aid to. To prove that the defendant possessed a firearm "in furtherance of" drug trafficking, you must find that the defendant possessed the firearm to advance or promote the commission of the underlying crime. Mere possession of the firearm at the time the offense was committed is not sufficient.

1-ER-21. In support, Alston cited two cases, *id.*, neither of which included his proposed language. *See* 4-ER-593. Alston argued that the "Ninth Circuit model instruction regarding § 924(c)" was deficient because it did not "adequately inform the jury that it may not convict based on mere possession of a firearm." SER-212–13.

The government explained that under this Court's precedent, the Count 3 instruction did not need to define "in furtherance of": that phrase carries its ordinary plain meaning and requires no elaboration. 4-ER-592–94 & n.9 (citing *Irons*, 31 F.4th at 708–10; *United States v. Lopez*, 477 F.3d 1110, 1115–16 (9th Cir. 2007)).

In reply, Alston acknowledged some of this Court's precedent. SER-117. But citing out-of-circuit caselaw, he argued that his proposed definition was "an accurate statement of the law." SER-118–21.

Alston repeated these arguments at the pretrial conference. 1-ER-17–19. Yet he conceded to the district court that under Ninth Circuit precedent, "you don't have to" define "in furtherance of." 1-ER-19. The court said that it had read *Irons* and the other cases cited by the parties and declined to define "in furtherance of" for the jury. 1-ER-19.

## IV. Trial

### A. *Preliminary jury instructions, opening statements, and evidence*

The district court instructed the jury that under Count 3, the government must prove three elements, including that "the defendant possessed the firearm in furtherance of a drug-trafficking crime as charged in the indictment." 2-ER-34–35; 1-ER-11–12; 4-ER-494.

Defense counsel focused his opening statement on Counts 1 and 2, the drug counts. 2-ER-48–55, 58–63. On Count 3, he argued that "'[f]urtherance of a crime' means advancing it, doing something to make it happen, using something to promote the activity." 2-ER-55.

The government called eight witnesses. SER-74. Alston did not put on a case. 4-ER-498, 503.

7

## B. Closing arguments

On Count 3, the government argued that "in furtherance of" carries its plain meaning and that Alston "possessed a firearm to promote or facilitate the underlying crime of distribution of fentanyl or possession with intent to deliver fentanyl." 4-ER-530.

Defense counsel focused his closing argument on Counts 1 and 2. 4-ER-535–46, 549–52. As for Count 3, counsel acknowledged that Alston possessed the pistol. 4-ER-548–49. But counsel argued that Alston's possession of the pistol was not "in furtherance of" any drug-trafficking crime. Counsel again purported to define that phrase for the jury and argued that the evidence did not meet the definition. 4-ER-547–49.

On rebuttal (4-ER-554–56), the government did not address the defense arguments about Count 3's "in furtherance of" element.

## C. Final jury instructions

The district court notified the parties that it planned to give a final instruction on Count 3 that did not define "in furtherance of." SER-84, 109; 4-ER-367–68. Defense counsel said that "[w]e respect the [c]ourt's decision" not to give several defense-proposed instructions "but

take exception," and the court responded that defense counsel "made [his] record on that." 1-ER-14; 4-ER-496.

In its final instructions, the court instructed the jury on all three elements of Count 3, including the "in furtherance of" element: "third, the defendant possessed the firearm in furtherance of the crime of distribution of a controlled substance as charged in Count 1 of the indictment or the crime of possession of a controlled substance with the intent to distribute as charged in Count 2 of the indictment, or both." 4-ER-512–13; 1-ER-10–12. During its deliberations, the jury asked no questions and did not request a definition of "in furtherance of."

### D. Guilty verdicts on Counts 1 through 3

The jury convicted Alston on all three counts in the trial's first phase. 4-ER-567–68. On Counts 1 and 2, the jury found him guilty of distributing fentanyl and possessing it with intent to distribute. 4-ER-567–68; SER-82. On Count 3, the jury unanimously found that he possessed the pistol "in furtherance of" both those drug-trafficking crimes. 4-ER-568; SER-83 (special verdict form).

### E.    Guilty pleas on Counts 4 and 5

After receiving the jury's verdicts on Counts 1 through 3, Alston abandoned his plan for a bifurcated trial on Counts 4 and 5. Instead, he pleaded guilty to those counts, admitting that he possessed his pistol and his revolver as a felon under 18 U.S.C. § 922(g)(1). 4-ER-572–83; PSR ¶¶ 2, 12; 1-ER-2. There was no plea agreement. PSR ¶ 2.

On appeal, Alston incorrectly asserts that he pleaded guilty only to Count 5. AOB-16. But as reflected in the plea transcript (4-ER-582–83), presentence report (PSR ¶¶ 2, 12), and judgment (1-ER-2), Alston in fact pleaded guilty to both Counts 4 and 5.

The district court conducted a detailed colloquy with Alston to confirm that his pleas were knowing and voluntary. 4-ER-577–83. Defense counsel assured the court that Alston's pleas were "fully informed and voluntary," that counsel's "discussions" with Alston about the pleas "occurred long before trial started," and that Alston "understands exactly what we're doing and why." 4-ER-582. The court accepted Alston's guilty pleas. 4-ER-583.

## V.    Sentencing

U.S. Probation highlighted Alston's long criminal history, which includes "many convictions for burglaries and thefts," plus domestic violence and other offenses. USPO Rec. 4. That history shows Alston's "capacity for violence." *Id.*

Alston argued that he should get acceptance-of-responsibility credit for pleading guilty to Counts 4 and 5. SER-28–30. The district court gave him that credit (SER-30) and a lenient sentence of five years and one day in prison—the mandatory minimum. SER-55; 1-ER-3.

Still, the court emphasized Alston's dangerousness. Fentanyl trafficking "is a very serious offense," and Alston "contributed" to the nation's ongoing "epidemic." SER-49. His possession of a gun while dealing fentanyl "increases the risk of danger." SER-50. He possessed a second gun during a "felony theft." SER-22. And his arrest after that theft "didn't dissuade" him from carrying a gun "in [his] drug distribution activities just two months later." SER-50. The court found that Alston's "activities pose a danger to the community for obvious reasons." *Id.*

11

## SUMMARY OF ARGUMENT

1.    On Count 3, the district court correctly instructed the jury on all three elements of 18 U.S.C. § 924(c)(1)(A)(i), including the "in furtherance of" element. The court did not define that phrase for the jury. But under binding precedent, no definition was required. The court also allowed Alston to present his definition of "in furtherance of" to the jury and argue that the evidence did not meet that definition. But the jury rejected his characterization of the evidence. The court committed no instructional error, plain or otherwise.

2.    On Counts 4 and 5, Alston waived his Second Amendment challenge to 18 U.S.C. § 922(g)(1) by not raising the claim before trial, as required. Instead, he pleaded guilty to both counts midtrial. If not waived, Alston's as-applied challenge to the felon-in-possession statute fails on plain-error review. The nation has a long tradition of disarming categories of people considered untrustworthy or dangerous. American legislatures have been disarming such individuals for centuries— without requiring case-by-case findings of dangerousness or irresponsibility. Section 922(g)(1) fits comfortably into that tradition.

## ARGUMENT

### I. The district court did not plainly err or abuse its discretion in formulating the 18 U.S.C. § 924(c) jury instructions

#### A. Standard of review

For preserved claims, the Court reviews the formulation of jury instructions for abuse of discretion. *United States v. Cabrera*, 83 F.4th 729, 736 (9th Cir. 2023). Unpreserved claims are reviewed for plain error. *Irons*, 31 F.4th at 711.

Alston did not preserve his specific claim of instructional error. First, he conceded to the district court that under Ninth Circuit precedent, "you don't have to" define the phrase "in furtherance of" for the jury. 1-ER-19. Second, the definition that Alston requested below differs from the one he cites on appeal—the current version of this Court's model instruction. *Compare* 1-ER-21 *with* 9th Cir. Model Crim. J. Instr. 14.23 (rev. March 2023) ("The phrase 'in furtherance of' means that the defendant possessed the firearm with the subjective intent of promoting or facilitating the crime of [*specify crime*]."). [1]

---

[1] https://www.ce9.uscourts.gov/jury-instructions/node/1196 (last visited Dec. 8, 2023). Alston asserts that this Court "approved" the new model instruction "around the time of [his] trial" (AOB-17), but he cites

(continued . . .)

Because Alston did not properly object to the Count 3 instruction, this Court should review it only for plain error. *United States v. Kessi*, 868 F.2d 1097, 1102–03 (9th Cir. 1989); Fed. R. Crim. P. 30(d). Alston cannot satisfy any of plain error's four requirements, *see United States v. Marcus*, 560 U.S. 258, 262 (2010), let alone all of them.[2] But even if Alston preserved his claim, it fails under binding precedent.

**B.    The district court acted well within its discretion by not defining "in furtherance of" for the jury**

This Court gives district courts "'substantial latitude' in formulating jury instructions." *United States v. Rodriguez*, 971 F.3d 1005, 1016 (9th Cir. 2020) (citation omitted). The district court "need not define common terms that are readily understandable by the jury." *United States v. Hicks*, 217 F.3d 1038, 1045 (9th Cir. 2000). And a

---

(continued . . .)

no support for that assertion. And model instructions are "neither adopted nor approved by the Ninth Circuit." Introduction, 9th Cir. Model Crim. Jury Instr. iv (2022 ed.).

[2] Alston does not say what standard of review he thinks should apply to his instructional-error claim. He limits his "Standard of review" section (AOB-18) to a discussion of the standard for assessing harmlessness. He has thus waived any argument for de novo review of his instructional-error claim. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[A]rguments not raised by a party in its opening brief are deemed waived.").

defendant "is not entitled to an instruction with wording of his own choosing." *United States v. Hofus*, 598 F.3d 1171, 1174 (9th Cir. 2010). "Neither party . . . may insist upon any particular language." *United States v. Soulard*, 730 F.2d 1292, 1303 (9th Cir. 1984).

Here, the district court correctly instructed the jury on all three elements of 18 U.S.C. § 924(c)(1)(A)(i), including the "in furtherance of" element. And the district court did not abuse its discretion in how it formulated that instruction.

Under this Court's "directly controlling precedent," a district court does "not err" by rejecting a defendant's "proposed instructions in favor of [a] simpler instruction" that leaves "the phrase 'in furtherance of' undefined." *Irons*, 31 F.4th at 710 (citing *Lopez*, 477 F.3d at 1115). This precedent forecloses Alston's claim of instructional error. No matter what standard of review applies, Alston's claim "can be readily rejected." *Id.* at 709.

This Court has long recognized that a district court does "not err"—plainly or otherwise—"by failing separately to define 'in furtherance' in its instructions to the jury on possession of a firearm in furtherance of a drug trafficking offense." *Lopez*, 477 F.3d at 1115. The

15

phrase "in furtherance of" is "a phrase of general use that naturally connotes more than mere possession," *id.* at 1115–16, so a trial court need not define it for a jury.

In arguing against that precedent, Alston relies on this Court's current model jury instruction, which now includes an optional definition for "in furtherance of." 9th Cir. Model Crim. J. Instr. 14.23 (rev. March 2023). For the first time on appeal, Alston asserts that the parties and the district court used the "2011 version" of the model instruction but should have used the "2022" version. AOB-18–20.

Alston's assertion is factually inaccurate and legally irrelevant. Below, the government cited the online version of the model instruction that the parties agreed was in place at the time. 4-ER-593 & n.8 (citing https://www.ce9.uscourts.gov/jury-instructions/node/1008).[3]

Plus, even today's version of the model instruction makes clear that a "district court does not err in failing separately to define 'in furtherance of' in its instruction to the jury on possession of a firearm in furtherance of a drug trafficking crime." 9th Cir. Model Crim. J. Instr.

---

[3] That link no longer works. The link to the new model instruction is in footnote 1, *supra.*

14.23 cmt. (rev. March 2023) (citing *Lopez*, 477 F.3d at 1115–16). The prior version of the model instruction included the same clarification. 4-ER-594. Alston ignores it.

Alston also ignores the more fundamental point that model instructions "are not authoritative legal pronouncements." *United States v. Tuan Ngoc Luong*, 965 F.3d 973, 983 (9th Cir. 2020). This Court "does not adopt" them "as definitive." Caveat, 9th Cir. Model Crim. Jury Instr. v (2022 ed.); *United States v. Saini*, 23 F.4th 1155, 1162 (9th Cir. 2022). Model instructions "are only models," "are not mandatory," and "have been neither adopted nor approved by the Ninth Circuit." Introduction, 9th Cir. Model Crim. Jury Instr. iv (2022 ed.).

Alston treats the current version of this model instruction as if it were precedent. It is not. Under this Court's precedent, as discussed, a trial court need not define "in furtherance of" for a jury—at least not unless the jury expresses confusion about the phrase's meaning.[4] Here,

---

[4] In *Irons*, this Court ultimately remanded for a new trial because the district court gave a flawed *supplemental* instruction, in response to a jury note, that sought to define "in furtherance of." 31 F.4th at 709. Although the supplemental instruction was erroneous, this Court found no fault in the district court's original instruction, which left "in

(continued . . .)

the jury expressed no confusion. So the district court was free to decline to separately define "in furtherance of"—a phrase that carries its ordinary plain meaning. *Irons*, 31 F.4th at 711–12; *Lopez*, 477 F.3d at 1115–16.

Alston offers no serious argument to the contrary. He instead contends that the alleged instructional error was not *harmless*. But that argument is a sideshow: he never establishes error in the first place.

Alston also repeatedly characterizes his proposed definition of "in furtherance of" as an "element" of the 18 U.S.C. § 924(c) charge. It is not. The offense has three essential elements. *Lopez*, 477 F.3d at 1115 n.17. To this day, the model instruction lists only those three elements—and an optional definition of "in furtherance of" is not one. 9th Cir. Model Crim. J. Instr. 14.23 & cmt. (rev. March 2023). Here, the district court instructed the jury on all three elements. 1-ER-10–12; 2-ER-34–35; 4-ER-512–13. The instructions were accurate.

---

(continued . . .)
furtherance of" undefined, *id.* at 708, 710—the same accurate instruction given here.

### C.   The alleged instructional error also did not prejudice Alston

This Court will not overturn a verdict based on instructional error unless the instruction prejudiced the defendant. *United States v. Lonich*, 23 F.4th 881, 898 (9th Cir. 2022). For preserved claims, the government bears the burden of showing that an error was harmless. *Id.* For unpreserved claims, the defendant must show prejudice. *United States v. Singh*, 979 F.3d 697, 728 (9th Cir. 2020).

Here, the district court committed no instructional error, so this Court need not decide what harmless-error standard applies. But if the Court reaches that issue, Alston's arguments against harmlessness fail.

First, the district court did not "omit[] an element of the offense." *Neder v. United States*, 527 U.S. 1, 8 (1999). So the heightened standard of harmlessness beyond a reasonable doubt would not apply. *Contra* AOB-21. At most, the Court would apply the normal harmlessness standard, *United States v. Rhodes*, 713 F.2d 463, 475–76 (9th Cir. 1983), under which the government must show that the prejudice resulting from an error was more probably than not harmless.

Second, regardless of the harmlessness standard, there is no realistic chance that supplementing the Count 3 jury instructions with

a definition of "in furtherance of"—where the jury showed no confusion about that phrase's meaning—would have changed the verdict.

Overwhelming evidence proved that Alston possessed his pistol to promote or facilitate his drug-dealing business. And Alston presented no evidence from which a reasonable jury could have concluded that he possessed the pistol for any other purpose. Alston kept his pistol within easy reach, in a backpack he wore on his right side—the same side where he kept his fentanyl pills in a jacket pocket and cash in a pants pocket. 2-ER-72–74, 99; 3-ER-157, 173–75, 232, 249–54, 298–301; 4-ER-387, 442, 464–65. He kept the pistol loaded with a round in the chamber, ready to fire. 2-ER-73, 77–81.

And Alston had strategic reasons for keeping his pistol in his backpack, not in his waistband or pocket. This .45-caliber model is unusually bulky and heavy—"so heavy that it would be uncomfortable" to carry in clothing. 4-ER-468–69. It is "incredibly difficult to conceal." 4-ER-469; *see also, e.g.*, 4-ER-422 ("[I]t would slip, it would ride down your pants leg or fall out if you were running . . . . It's easily identifiable. The cops look for heavy things in pockets . . . ."); 2-ER-118.

The jury also heard uncontroverted testimony that guns are important tools of the drug-trafficking trade. 4-ER-467. Drug dealers rarely use holsters, as they "don't want to be seen with a gun," which could attract unwanted attention. 4-ER-422, 468. But drug dealers often keep their guns within "close proximity," including in backpacks. 4-ER-467–68. Keeping a gun in a backpack does not make it any less effective. 4-ER-422. And Alston's backpack was easy to unzip. 2-ER-77.

"When guns are located within strategic reach of a dealer such that they can use the guns to protect their illicit trade or the proceeds thereof"—as here—"then a defendant's possession would typically be characterized as 'in furtherance of' the drug crime." *United States v. Mahan*, 586 F.3d 1185, 1188 (9th Cir. 2009); *see Lopez*, 477 F.3d at 1115 (emphasizing "ready accessibility").

Alston presented no evidence that would have supported a contrary conclusion. Instead, his counsel offered hypothetical explanations for his pistol that lacked support in the record. When cross-examining a police officer, for example, defense counsel asked about "hunting" and the importance of having a hunting gun "accessible." 2-ER-92. The officer was not a hunter. *Id.* Defense counsel

asked the same officer whether he kept his service weapon in a backpack, *id.*—questions irrelevant to why Alston, a felon and drug dealer, would keep his illegal bulky handgun in a backpack while he dealt drugs and tried to avoid the police.

Defense counsel continued this strategy in closing arguments, posing hypotheticals and wondering whether Alston's pistol was "[b]eing moved from one place to another? Being purchased? Being traded? Taking it to somebody to clean it? Who knows." 4-ER-549.

The jury knew. On Count 3, the jury unanimously found that Alston possessed his pistol in furtherance of not just one but two drug-trafficking crimes. 4-ER-568; SER-83.

Alston gives no reason to think that the jury's verdict would have differed if only the district court had defined "in furtherance of." He cites cases in which this Court found the evidence sufficient to satisfy the "in furtherance of" requirement. AOB-21–22. But those cases do not establish a minimum type of evidence required. To the contrary, "[w]hen deciding whether sufficient evidence supports a conviction under § 924(c)," this Court refuses to "resort to a checklist." *United States v. Krouse*, 370 F.3d 965, 968 (9th Cir. 2004). At any rate, Alston

cites no case in which the Court found nexus evidence lacking on facts like those here. And although Alston seems to want this Court to draw different inferences from the evidence than the jury drew, he asserts no sufficiency-of-the-evidence claim.

Alston's other arguments fare no better. For the first time on appeal, he suggests that the district court's Count 3 instructions prevented him from presenting his "in furtherance of" theory to the jury. AOB-23. Not so. Through counsel, Alston offered his definition in opening statements and closing arguments, without objection, and he argued that the government failed to satisfy the definition. 2-ER-55–58; 4-ER-457–59. The jury just disagreed with his characterization of the evidence.

Finally, the government never suggested that mere possession of a gun sufficed under Count 3. On the contrary, the government argued that Alston was guilty because he "possessed a firearm to promote or facilitate the underlying crime of distribution of fentanyl or possession with intent to deliver fentanyl." 4-ER-530.

But again, Alston's harmless-error arguments are beside the point. No instructional error occurred.

23

## II. Alston's as-applied Second Amendment challenge to 18 U.S.C. § 922(g)(1) is waived and meritless

### A. *Alston waived this claim by not raising it pretrial*

The Court should not reach the merits of Alston's Second Amendment challenge to 18 U.S.C. § 922(g)(1) because he waived it.

A defense based on a defect in the indictment "must be raised by pretrial motion," so long as "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3). That rule includes a defense that an indictment "fail[s] to state an offense." Fed. R. Crim. P 12(b)(3)(B)(v).

A challenge to a criminal statute's constitutionality is a defense that the indictment fails to state an offense. *See United States v. Gilbert*, 813 F.2d 1523, 1528–29 (9th Cir. 1987) (citing *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973)). And a failure to timely raise a pretrial objection required by Rule 12, absent a showing of "good cause," constitutes a waiver. Fed. R. Crim. P. 12(c); *United States v. Guerrero*, 921 F.3d 895, 897–98 (9th Cir. 2019) (per curiam).

Alston concedes that his claim is unreviewable unless he shows good cause. AOB-34–35. He cannot show it. He bases his new Second Amendment claim on *New York State Rifle & Pistol Association, Inc. v.*

*Bruen*, 597 U.S. 1 (2022). But the Supreme Court decided *Bruen* more than a month before Alston's trial. *Bruen*, in turn, built on *District of Columbia v. Heller*, 554 U.S. 570 (2008), which predated Alston's trial by more than a decade. Nothing prevented Alston from challenging section 922(g)(1) in the district court based on *Heller*, *Bruen*, or both, like scores of other defendants have done nationwide.

Alston also tries to show good cause by citing *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc), and *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) (en banc), *vacated and remanded*, 142 S. Ct. 2895 (2022).[5] But if anything, those cases underscore Alston's lack of good cause. Those challengers asserted timely Second Amendment claims in district court. And neither decision affects this Court's precedent upholding section 922(g)(1) as constitutional.

Finally, Alston tries to show good cause by citing the Supreme Court's June 2023 grant of certiorari in *United States v. Rahimi*, No. 23-

---

[5] The Third Circuit's "narrow" decision in *Range* found section 922(g)(1) unconstitutional "only as applied to" an appellant with a 15-year-old conviction for lying to obtain food stamps. 69 F.4th at 98, 106. In *Young*, this Court upheld Hawaii's licensing regime for open-carrying a firearm in public. In June 2022—before Alston's trial—the Supreme Court vacated *Young* and remanded for further consideration in light of *Bruen*.

915 (argued Nov. 7, 2023). *Rahimi* will decide the constitutionality of 18 U.S.C. § 922(g)(8)—not section 922(g)(1). And the petitioner in *Rahimi*, unlike Alston, asserted his timely Second Amendment challenge in district court: he moved to dismiss his indictment even though binding circuit precedent at the time foreclosed his motion. *United States v. Rahimi*, 61 F.4th 443, 449 (5th Cir. 2023).

Alston could have done the same. He elected not to. Instead, he entered unconditional midtrial guilty pleas and received acceptance-of-responsibility credit at sentencing. SER-28–30. He now tries to change tack. But because he failed to timely challenge the constitutionality of section 922(g)(1) below, and because he has not shown good cause, he has waived the claim. The Court should not consider it.

### B.    *Standard of review on the merits*

If not waived, Alston's constitutional claim is reviewable for plain error. *United States v. Chi Mak*, 683 F.3d 1126, 1133 (9th Cir. 2012); *United States v. Matus-Zayas*, 655 F.3d 1092, 1098–99 (9th Cir. 2011).

Alston admits that "[i]f reviewable, the standard of review would normally be plain error." AOB-36. But he claims that this Court's "pure question of law" exception applies. *Id.* He is mistaken.

This Court has the discretion to review a forfeited claim de novo if (1) the appeal presents a pure question of law and (2) the opposing party would suffer no prejudice. *United States v. Yijun Zhou*, 838 F.3d 1007, 1011–12 (9th Cir. 2016); *see also United States v. Castillo*, 69 F.4th 648, 653 (9th Cir. 2023) (questioning the validity of the "pure question of law" exception).[6]

Alston's claim fails both tests. First, he has not presented this Court with a pure question of law. He challenges the constitutionality of section 922(g)(1) only as applied to him—an inherently factual claim. *See United States v. Peeples*, 630 F.3d 1136, 1138 (9th Cir. 2010) (distinguishing between facial and as-applied claims); *see also Young*, 992 F.3d at 779 ("[A]n as-applied challenge is 'wholly fact dependent'"), *abrogated on other grounds by Bruen*, 597 U.S. at 70. "[S]omeone who wants us to carve out particular felonies (or felons) from a category that the Supreme Court has said is presumptively valid"—as Alston wants to do—"must supply an adequate basis for that distinction." *Hatfield v.*

---

[6] For his "pure question of law" argument (AOB-36), Alston cites two cases involving Sentencing Guidelines claims: *United States v. Evans-Martinez*, 611 F.3d 635, 642 (9th Cir. 2010), and *United States v. Torres*, 828 F.3d 1113, 1123 (9th Cir. 2016). Neither supports his bid for de novo review of his as-applied Second Amendment claim.

*Barr*, 925 F.3d 950, 953 (7th Cir. 2019). Alston's as-applied claim thus presents a "mixed question of law and fact, not a pure question of law." *Yijun Zhou*, 838 F.3d at 1012 (cleaned up).

Second, Alston's untimeliness has prejudiced the government. If he had raised his as-applied claim below, the government could have developed the record—including all facts underlying the felon-in-possession counts to which Alston pleaded guilty without a plea agreement, *see* PSR ¶ 12, plus other facts in his background that underscore his dangerousness and untrustworthiness. It makes no difference whether Alston now purports not to dispute "[t]he facts of his prior convictions" or "his possession of the handguns in Counts 4 and 5" (AOB-36) on the *existing* record. By not raising his claim below, he prevented the government from *developing* the record. Also, by pleading guilty, he misled the district court into believing that he had accepted responsibility (SER-28–30) for crimes that he now says are not crimes.

Accordingly, if Alston's Second Amendment claim is reviewable at all, it is reviewable only for plain error.

### C.    *Under binding Ninth Circuit precedent, section 922(g)(1) is constitutional*

Under this Court's precedent, section 922(g)(1) is constitutional as applied to all felons. That precedent remains binding after *Bruen*.

### 1.    *The Supreme Court held in* Heller *that the Second Amendment protects an individual right of law-abiding citizens*

The Second Amendment recognizes "the right of the people to keep and bear Arms" and says the right "shall not be infringed." U.S. Const. amend. II. In its 2008 *Heller* decision, the Supreme Court held that "on the basis of both text and history," the Second Amendment protects an individual right to keep and bear arms. 554 U.S. at 595.

But *Heller* made clear that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. *Heller* described these "permissible" measures as falling within "exceptions" to the protected right. *Id.* at 635. And *Heller* identified the right to keep and bear arms as belonging to "law-abiding, responsible citizens." *Id.*

Consistent with that understanding, the Supreme Court said that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," which the Court considered "presumptively lawful." *Id.* at 626 & n.26. Indeed, the Court

said the plaintiff, Heller, could keep a handgun in his home "assuming" that he is "not disqualified from the exercise of Second Amendment rights." *Id.* at 635; *see id.* at 631 (assuming Heller was "not a felon").

Two years later, a plurality of the Supreme Court "repeat[ed]" its "assurances" that *Heller*'s holding "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons." *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626–27).

<div style="margin-left:2em">

2.   *After* Heller*, this Court upheld section 922(g)(1) based on the Second Amendment's text and history*

</div>

After *Heller*, this Court relied on the Second Amendment's text and history to uphold the constitutionality of 18 U.S.C. § 922(g)(1)— including as applied to nonviolent felons. *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010). This Court determined that "[n]othing in *Heller* can be read legitimately to cast doubt on the constitutionality of § 922(g)(1)." *Id.* at 1114–15. And this Court, relying on *Heller*, held that "felons are categorically different from the individuals who have a fundamental right to bear arms." *Id.* at 1115.

30

To confirm its conclusion, this Court examined "cases from other circuits" and "historical gun restrictions." *Id.* at 1116–17. And while recognizing that the "historical question" had not been "definitively resolved," this Court concluded that "most scholars of the Second Amendment agree that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry],'" which excludes criminals. *Id.* at 1118 (citations omitted).

This Court did not—even as an alternative holding—engage in an analysis involving intermediate scrutiny, strict scrutiny, or any "means-end" scrutiny balancing the costs and benefits of prohibiting felons from possessing firearms. *Cf. id.* at 1117 (mentioning "heightened scrutiny" only to describe the Fifth Circuit's pre-*Heller* precedent). Instead, *Vongxay* based its holding on *Heller*'s analysis of "the history of the Second Amendment." *Id.* at 1115.

*Vongxay* also rejected a defense argument that *Heller*'s language about firearm-possession bans for persons convicted of a felony crime were nonbinding dicta. 594 F.3d at 1115; *contra* AOB-26, 33. And this Court supported its holding with precedent and with analysis of the Second Amendment's text and history. 594 F.3d at 1116–18.

This Court later relied on *Vongxay* to reject other Second Amendment challenges to section 922(g)(1). *E.g.*, *United States v. Phillips*, 827 F.3d 1171, 1173–74 (9th Cir. 2016); *Van Der Hule v. Holder*, 759 F.3d 1043, 1050–51 (9th Cir. 2014); *cf. United States v. Chovan*, 735 F.3d 1127, 1144–45 (9th Cir. 2013) (Bea, J., concurring) (observing that "*Heller* seemed to equate the status of a felon . . . with a presumptive disqualification from the Second Amendment right," because "[t]hroughout history, felons have been subject to forfeiture and disqualification"), *abrogated on other grounds by Bruen*, 597 U.S. 1.[7]

> 3.  *Ninth Circuit precedent remains controlling, and its history-based analysis is reaffirmed—not overruled—by* Bruen

The Supreme Court's 2022 decision in *Bruen* changed none of this. *Heller* based its reasoning on the "text and history" of the Second Amendment. 554 U.S. at 595. *Vongxay* did the same. 594 F.3d at 1115, 1118. And in *Bruen*, the Supreme Court reaffirmed this focus on "the Second Amendment's text, as informed by history." 597 U.S. at 19; *see also id.* at 22 ("constitutional text and history").

---

[7] *Chovan* concerned 18 U.S.C. § 922(g)(9), which prohibits firearm possession by persons convicted of domestic-violence misdemeanors.

*Bruen* involved a state licensing regime for the public carrying of handguns that required applicants to show a "special need" to carry a gun in public. 597 U.S. at 11–12. The applicants and the state agreed that the Second Amendment "protect[s] the right[s]" of "ordinary, law-abiding citizens . . . to carry handguns publicly for their self-defense." *Id.* at 11; *see also id.* 31–32. The court of appeals, however, had upheld the "special need" licensing regime because it satisfied intermediate scrutiny—i.e., that restricting the right to bear arms in public to those with a special need was "substantially related to the achievement of an important governmental interest." *Id.* at 17.

In striking down that state law on Second Amendment grounds, the Supreme Court explained in *Bruen* that it was applying "[t]he test that we set forth in *Heller*," *id.* at 26, but making it "more explicit," *id.* at 31. The Court rejected the "two-step" framework adopted by most courts of appeals after *Heller* that "combine[d] history with means-ends scrutiny." *Id.* at 17. The Court upheld step one as "broadly consistent with *Heller*." *Id.* at 19. But the Court rejected the means-ends analysis of step two, as *Heller* "demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 19, 22–23.

33

In place of means-ends scrutiny, the Court set forth a different two-part test informed by *Heller*'s text-and-history standard. First, the challenger must show that the Second Amendment covers his conduct, because "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24.

Second, when a regulation infringes on protected conduct, the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. But the government need only identify a "historical *analogue*, not a historical *twin*." *Id.* at 30. And the Court made "clear" that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.*

After applying that two-part test in *Bruen* and undertaking a long historical analysis, *id.* at 30–70, the Supreme Court held that a state cannot "prevent[] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms" in public. *Id.* at 71.

*Bruen* did not undermine *Vongxay*'s holding or *Heller*'s recognition that felons do not have a constitutional right to bear arms. In fact, the

Supreme Court stressed that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of licensing regimes that "require applicants to undergo a background check" to "ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens." *Id.* at 38 n.9 (quoting *Heller*, 554 U.S. at 635). The Supreme Court repeatedly limited its definition of the scope of the right to "law-abiding" citizens, using that phrase more than a dozen times. *See id.* at 9, 15, 26, 29, 30, 31, 33 n.8, 38 & n.9, 60, 70.

Consistent with that understanding, Justice Alito wrote in a concurrence that "[o]ur holding decides nothing about who may lawfully possess a firearm," and does not "disturb[] anything that we said in *Heller* or *McDonald*." 597 U.S. at 72 (Alito, J., concurring).

Likewise, Justice Kavanaugh, in a concurrence joined by the Chief Justice, wrote that "[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," which are "presumptively lawful regulatory measures." 597 U.S. at 80–81 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626–27 & n.26). And Justice Breyer, in a dissent joined by Justices Sotomayor and Kagan, wrote that "[l]ike Justice Kavanaugh, I

35

understand the Court's opinion today to cast no doubt on" *Heller*'s comments about felon-in-possession bans. 597 U.S. at 129 (Breyer, J., dissenting).[8]

Alston ignores those clear statements. He insists that *Bruen* abrogated this Court's precedent, including *Vongxay*, and requires this Court to find section 922(g)(1) unconstitutional as applied to him. AOB-29–33. He is wrong.

Nothing in *Bruen* is "clearly irreconcilable" with *Vongxay*—a high bar. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003), *overruled on other grounds by Sanchez v. Mayorkas*, 141 S. Ct. 1809 (2021). "It is not enough for there to be 'some tension' between the cases or for the intervening authority to 'cast doubt' on this Court's prior authority." *Tingley v. Ferguson*, 47 F.4th 1055, 1075 (9th Cir. 2022) (citation omitted). If this Court "can apply our precedent consistently with that

---

[8] Alston relies heavily on a dissent that Justice Barrett wrote as a Seventh Circuit judge, where she questioned precedent for extending firearm prohibitions to nonviolent felons. *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting). But she acknowledged the precedent for "disarm[ing] those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety." *Id.*; *see id.* at 451, 456.

of the higher authority," the Court "must do so." *Avilez v. Garland*, 69 F.4th 525, 533 (9th Cir. 2023) (citation omitted).

*Vongxay* and *Bruen* are easily reconcilable. In making refinements to *Heller*, the Supreme Court in *Bruen* did not cast doubt on its prior statements about felon-dispossession laws. To the contrary, *Bruen* supports *Vongxay*'s holding and *Heller*'s acknowledgment that felons lack a constitutional right to bear arms. The *Bruen* Court said that it was "reiterat[ing]" *Heller*'s approach, clarifying the legal standard in "keeping with *Heller*," and applying the "test . . . set forth in *Heller*." 597 U.S. at 17–18, 22–23, 26. *Bruen* thus reinforces *Vongxay* and this Court's text-and-history analysis.

Alston's contrary arguments misread *Heller*, and *Bruen*, and this Court's precedent. First, this Court in *Vongxay* did not improperly rely on cases holding that the Second Amendment protected a collective rather than individual right. *See* AOB-26–27. *Vongxay* postdated *Heller*, and this Court recognized that *Heller* "invalidated" this Court's pre-*Heller* cases holding that the Second Amendment did not protect an individual right. 594 F.3d at 1116. Indeed, this Court has already

rejected the argument that *Vongxay* somehow invalidated itself by citing pre-*Heller* precedent. *Phillips*, 827 F.3d at 1174 n.1.

Second, as noted, *Vongxay* does not refer to, much less apply, a "means-end test" to hold that section 922(g)(1) is constitutional. *United States v. Jackson*, 656 F. Supp. 3d 1239, 1243 (W.D. Wash. 2023); *see also United States v. Hindman*, No. 23-CR-5062-DGE, 2023 WL 8020699, at *3 & n.1 (W.D. Wash. Nov. 20, 2023) ("*Vongxay* did not apply the means-ends scrutiny rejected by *Bruen*," and "at least 20 courts in this circuit" have found that *Vongxay* remains binding). *Bruen*'s rejection of an analysis that this Court did not use in *Vonxay* cannot have "effectively overruled" *Vongxay*. *Miller*, 335 F.3d at 893.

Third, *Bruen* did not cast doubt on the prohibitions that *Heller* recognized as "presumptively lawful," 554 U.S. at 627 n.26, including felon-in-possession bans.[9] Nor did *Bruen* disturb *Vongxay*'s conclusion that *Heller*'s statement about presumptively lawful measures was

---

[9] *Bruen* also did not invalidate prohibitions on carrying concealed weapons. *See* AOB-33. Rather, *Bruen* struck down general bans on carrying firearms "in public," 597 U.S. at 33, and explained that states historically "could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly," *id.* at 59.

"integral" to the holding in *Heller*—not dicta. *Vongxay*, 594 F.3d at 1115; *see Phillips*, 827 F.3d at 1173–74.[10] And at any rate, *Vongxay* did not uphold section 922(g)(1) based solely on *Heller*'s categorization of felon-in-possession bans as presumptively lawful. *Vongxay* also considered the Second Amendment's history and purpose, 594 F.3d at 1117–18, like the Supreme Court did in *Bruen*.

Thus, *Vongxay* and cases applying it constitute controlling circuit precedent, under which section 922(g)(1) is constitutional as applied to all felons. On this point, district courts throughout the circuit agree. *Hindman*, 2023 WL 8020699, at *3 & n.1 (collecting cases). These courts are right: *Vongxay* remains binding precedent and forecloses Alston's claim.

## D. Ninth Circuit precedent aside, section 922(g)(1) is constitutional as applied to Alston

Even if *Bruen* required this Court to consider 18 U.S.C. § 922(g)(1)'s constitutionality afresh, Alston could not prevail. For more than six decades, Congress has restricted the possession, receipt, and

---

[10] Even if those repeated statements were dicta—contrary to this Court's conclusions in *Vongxay* and *Phillips*—Supreme Court dicta commands "deference" and may not be "lightly" discarded. *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc).

transportation of firearms by felons—persons who have been convicted of crimes "punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1); *see id.* § 921(a)(20). Contrary to Alston's claim, this longstanding law complies with the Second Amendment. And it is not subject to individualized challenges based on the nature of a particular criminal's offenses or circumstances.

> 1.   *Supreme Court precedent recognizes that Congress may disarm felons*

The Supreme Court precedents already discussed—*Heller*, *McDonald*, and *Bruen*—recognize that Congress may disarm all felons. Many aspects of Second Amendment doctrine rest on the premise that the Amendment protects only law-abiding citizens, not felons.

For example, in judging whether modern firearms regulations align with their historical precursors, courts must ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. In judging whether the Second Amendment protects certain weapons, courts must consider whether those weapons are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. And the government may require gun owners to pass background checks—which include a check

40

for felony convictions—because such checks ensure that those who carry guns "are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9 (citation omitted). Section 922(g)(1) tracks this precedent.

> 2. *Text, history, and tradition confirm that Congress may disarm felons*

Three independent but mutually reinforcing legal principles support *Heller*'s approval of felon-disarmament laws. First, felons disqualified from possessing firearms under section 922(g)(1) are not among "the people" protected by the Second Amendment. Second, the Amendment has historically been understood to protect law-abiding individuals, not felons. Third, the Amendment has historically been understood to protect only responsible individuals. And felons, as a category, are not responsible.

> a. *Felons are not among "the people" protected by the Second Amendment*

The Second Amendment secures "the right of *the people* to keep and bear arms." U.S. Const. Amend. II (emphasis added). "'The people'" is "a term of art employed in select parts of the Constitution" to refer to "a class of persons who are part of a national community." *Heller*, 554 U.S. at 580 (cleaned up). The Second Amendment thus guarantees this

41

right only to "members of the political community," not to all persons. *Id.* And from the Founding to the present, legislatures retained wide latitude to exclude felons from the political community.

The Second Amendment's background illuminates the reasons for that limitation. The Founders codified the right to bear arms in large part because they saw it as an important "safeguard against tyranny." *Heller*, 554 U.S. at 600. Justice Story, for instance, described this right as the "palladium of the liberties of a republic" and explained that it "enable[s] the people to resist and triumph over" the "usurpation and arbitrary power of rulers." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890, at 746 (1833). It makes sense that a right codified to enable the polity to "resist tyranny," *Heller*, 554 U.S. at 598, would be limited to members of that polity.

Consistent with that understanding, persons who do not belong to the political community have historically been denied the right to bear arms. For example, that right has historically been reserved to "citizens." *Heller*, 554 U.S. at 635; *see id.* at 581 ("Americans"). Noncitizens at the Founding lacked the "right to bear arms"—just as they lacked other "rights of members of the polity," such as the right to

"vote, hold public office, or serve on juries." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998).

This reality aligns with this Court's view that "most scholars of the Second Amendment agree that the right to bear arms was inextricably tied to the concept of a 'virtuous citizenry' that would protect society through defensive use of arms against criminals, oppressive officials, and foreign enemies alike, and that the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals)." *Vongxay*, 594 F.3d at 1118 (cleaned up).

Felons disarmed under section 922(g)(1) are not among "the people" protected by the Second Amendment, as they have forfeited their membership in the political community. *Cf. Voisine v. United States*, 579 U.S. 688, 715 (2016) (Thomas, J., dissenting) (tying *Heller*'s approval of felon disarmament to the understanding that certain individuals "are beyond the scope of the 'People' protected by the Second Amendment").

Thus, states have long denied felons the rights of members of the polity—the right to vote, *see* U.S. Const. Amend. XIV, § 2; *Richardson v. Ramirez*, 418 U.S. 24, 41–56 (1974); the right to hold public office, *see*

*Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998); and the right to serve on juries, *see id.* And as Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, "the people in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28–29 (1st ed. 1868); *see also Kanter v. Barr*, 919 F.3d 437, 446 n.6 (7th Cir. 2019) (citing Cooley and "numerous legal historians"), *abrogated on other grounds by Bruen*, 597 U.S. 1.

On the right to vote, for example, the Constitution provides for the election of the House of Representatives and Senate by "the people." *See* U.S. Const. Art. I, § 2, Cl. 1; Amend. XVII, Cl. 1. Those provisions secure an individual "right to vote for representatives in Congress." *United States v. Classic*, 313 U.S. 299, 314 (1941). Yet the Supreme Court has recognized that the states' power to set qualifications for voters in congressional elections authorizes the states to disqualify felons—as many states have long done. *Richardson*, 418 U.S. at 41–56.

44

Just as legislatures may provide that a felony conviction excludes a person from "the people" entitled to vote, Congress may direct that one consequence of a felony conviction is exclusion from "the people" entitled to keep and bear arms.

Alston offers no persuasive argument to the contrary. He notes (AOB-37) that other constitutional provisions use the term "the people" and argues that the term's meaning should not vary from provision to provision. But while the phrase "the people" refers to members of the political community throughout the Constitution, *see Heller*, 554 U.S. at 580, the *scope* of that community varies from provision to provision. For example, noncitizens are not among "the people" protected by the Second Amendment, *see id.* at 581, but certain noncitizens are among "the people" protected by the Fourth Amendment, *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 271–73 (1990).

The same holds true of felons. Again, several other constitutional provisions use the term "the people" in a way that excludes felons who have forfeited the rights that come with membership in the polity. Such felons are not among "the people" who adopted the Constitution, *see* U.S. Const. Pmbl; or "the people" who entitled to elect members of

Congress, *see* U.S. Const. Art. I, § 2, Cl. 1; Amend. XVII, Cls. 1–2; or "the people" who reserved powers not delegated to the government, *see* U.S. Const. Amend. X. So too, felons are not among "the people" entitled to keep and bear arms.

        b.    *The right to bear arms has historically been understood to extend only to law-abiding persons*

Apart from the Second Amendment's textual limitation to "the people," the right to bear arms has historically been understood to extend only to law-abiding persons. The right thus does not extend to felons—much less to multiple-convicted violent felons like Alston who possessed firearms in furtherance of other crimes.

Before the Founding, felons in England had no right to keep and bear arms. The standard penalty for a felony was death. *See* 4 William Blackstone, *Commentaries on the Laws of England* 98 (1769). That punishment extended even to nonviolent felonies, such as smuggling, *id.* at 155; fraudulent bankruptcy, *id.* at 156; violating quarantine, *id.* at 162; forging a marriage license, *id.* at 163; and cutting down a cherry tree, *id.* at 4. A felon awaiting execution would be held in prison—where he would have no access to arms. *See id.* at 131

46

(discussing a statute making it unlawful to provide "any arms" to a "prisoner in custody for treason or felony").

A conviction would also usually result in the escheat of the felon's estate and the forfeiture of all his goods and chattels—including, of course, his arms. *See id.* at 379–82. A felon was considered "already dead in law" even before his execution. *Id.* at 374. That status, known as "civil death," involved "an extinction of civil rights, more or less complete." *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888). A felon thus had no "right to vote, to sit as a juror, *to bear arms*, [or] to marry"; indeed, "his physical conditions were such that he could do none of these things." *Id.* at 156 (Earl, J., dissenting) (emphasis added).

Early Americans accepted that legislatures had the power to subject felons to similar deprivations. Thus, "death was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (citation omitted). As in England, the death penalty extended even to nonviolent crimes, like forgery and horse theft. *See Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019). Many states also subjected certain felons to the complete forfeiture of their estates or their goods and chattels. *See* Beth A. Colgan, *Reviving*

*the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 nn.275–276 (2014) (collecting statutes). And at least some states enacted statutes carrying forward the common-law doctrine of civil death. *See, e.g.*, *In re Deming*, 10 Johns. 232, 233 (N.Y. 1813) (per curiam).

Those punishments were justified by the belief that a person can lose his legal rights by violating "his part of the [social] contract." 4 Blackstone 375. Capital punishment, for example, was justified because the right to life can be "forfeited for the breach of th[e] laws of society." 1 Blackstone 129. The confiscation of felons' estates was also justified on the ground that property was a right derived from society which one lost by violating society's laws." *Austin v. United States*, 509 U.S. 602, 612 (1993); *see Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 682 (1974) ("[A] breach of the criminal law . . . was felt to justify denial of the right to own property."). And civil death was justified because someone who has committed a felony should no longer possess "any rights growing out of organized society." *Avery*, 18 N.E. at 155 (Earl, J., dissenting).

Because the traditional punishment for serious crimes was death, early legislatures had little occasion to enact laws explicitly disarming

48

persons convicted of such crimes. But they did enact laws disarming persons who had committed certain offenses not punishable by death.

For example, an English statute provided that a person could not "keep arms" if he had been "convicted in a court of law of not attending the service of the church of England." 4 Blackstone 55; *see* 3 Jac. 1, c. 5, § 16 (1605) (Eng.). In 1624, Virginia punished a person for "base" and "opprobrious" speech by ordering him "disarmed" and declaring him ineligible to exercise "any priviledge or freedom" in the colony. David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982). And in 1775, Connecticut enacted a statute providing that a person who was convicted of "libel[ing] or defam[ing]" certain colonial resolutions "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776* at 193 (Charles J. Hoadly ed., 1890). That these legislatures disarmed people who committed those offenses strongly suggests the constitutionality of disarming people who commit any felony.

Moreover, some Founding-era sources expressly recognized that the right to bear arms extended only to law-abiding people. In 1780, for

example, the Town of Williamsburg, Massachusetts, adopted a resolution proclaiming that "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and *while we Continue honest and Lawfull Subjects of Government* we Ought Never to be deprived of them." *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780* at 624 (Oscar Handlin & Mary Handlin eds., 1966) (emphasis added). And Anti-Federalists at the Pennsylvania ratifying convention proposed a bill of rights that, among other things, forbade "disarming the people or any of them, *unless for crimes committed*, or real danger of public injury from individuals." 2 *The Documentary History of the Ratification of the Constitution* 598 (Merrill Jensen ed., 1976) (emphasis added).

In sum, the "widespread, continued condemnation of felons, including those who committed non-violent offenses, to death demonstrates that in 1791 Americans understood felons as a group, to commit serious crimes." *Folajtar v. Att'y General*, 980 F.3d 897, 905 (3d Cir. 2020), *abrogated by Range*, 69 F.4th 96. It is also compelling evidence that the "framers could not have intended Second Amendment guarantees to apply to felons if, as a rule, all the felons were dead." Dru

Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1587 (2022). Thus, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158.

> c. *The Second Amendment has historically been understood to protect only responsible individuals—and felons are categorically irresponsible*

As reflected in historical examples, the Second Amendment allows Congress to disarm irresponsible individuals—that is, individuals whose possession of firearms would endanger themselves or others.

The government cited many such examples to the Supreme Court in *Rahimi*, No. 22-915 (Gov't Br. 10–27). And in appeals pending before this Court, the government has cited scores of historical analogues to section 922(g)(1). *E.g.*, *United States v. Duarte*, No. 22-50048, Dkt. 33 (argued Dec. 4, 2023); *United States v. Howard*, No. 22-10211, Dkt. 33. The government incorporates those citations here.[11]

---

[11] *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("[W]e 'may take notice of proceedings in other courts, both within and without the federal judicial

(continued . . .)

English law before the Founding allowed the disarmament of dangerous individuals; an influential Second Amendment precursor contemplated the disarmament of individuals who posed a "real danger of public injury"; 19th-century sources recognized legislatures' power to disarm individuals whose possession of arms would endanger the public; and American legislatures have been disarming such individuals since the 17th century. Gov't Br., *Rahimi*, at 27–28.

In exercising that power, Congress need not require case-by-case findings of dangerousness. Congress may make categorical judgments about responsibility. That "some categorical limits are proper is part of the original meaning" of the Second Amendment. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). For example, past legislatures enacted laws categorically disarming loyalists, *see Rahimi* Gov't Br. 22; minors, *see id.* at 24 & n.16; and vagrants, *see id.* at 25 & n.18—each time without requiring case-by-case findings of dangerousness or irresponsibility.

---

(continued . . .)
system, if those proceedings have a direct relation to matters at issue.'" (citation omitted)).

Other examples of section 922(g)(1) analogues abound. In England, the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13; *see United States v. Brown*, No. 2:22-cr-00239-JNP-CMR, 2023 WL 4826846, at *9 (D. Utah July 27, 2023) (quoting same). The use of that statute "continued unabated" after the adoption of the 1689 English Bill of Rights, which expressly guaranteed the right to keep and bear arms. Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405 (2019).

Thus, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see id.* at 259–61 (detailing that history); *see United States v. Jackson*, 69 F.4th 495, 502–04 (8th Cir. 2023) (same).

The American colonies and the states continued that tradition.[12] Some early laws categorically disarmed entire groups perceived as dangerous or untrustworthy—for example, those "who refused to declare an oath of loyalty." *Jackson*, 69 F.4th at 503 (citing examples); *see also Medina*, 913 F.3d at 159. Other laws disarmed individuals who had shown their dangerousness by engaging in certain conduct, like carrying arms in a manner that spreads fear or terror among the people. *See, e.g.*, Act for the Punishing of Criminal Offenders, 1692 Mass. Acts & Laws 11–12; Act for the Punishing Criminal Offenders, 1696–1701 N.H. Laws 15.

In England, "the act of 'go[ing] armed to *terrify* the King's subjects' was 'a great offence at the *common law*,'" so long as it was committed with "evil intent or malice." *Bruen*, 597 U.S. at 44 (citation omitted). So too in the American colonies and the states: they enacted laws that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among

---

[12] *See, e.g.*, *Bruen*, 597 U.S. at 121 (Breyer, J., dissenting) (citing Act for the Punishing of Criminal Offenders, 1692 Mass. Acts & Laws no. 6, pp. 11–12; An Act for the Punishing of Criminal Offenders, 1771 N.H. Acts and Laws ch. 6, § 5, p. 17); Duke University School of Law, Center for Firearms Law, *Repository of Historical Gun Laws*, https://firearmslaw.duke.edu/repository/search-the-repository.

the people." *Id.* at 50. Such statutes "all but codified the existing common law in this regard." *Id.* at 49 n.14 (citation omitted). And such statutes show that legislatures restricted gun possession by persons or groups considered to present "an unacceptable risk of danger if armed." *Jackson*, 69 F.4th at 504.

Section 922(g)(1) accords with that tradition of imposing categorical limits on the right to keep and bear arms. "[N]umerous studies" show a "link between past criminal conduct and future crime, including gun violence." *Binderup v. Att'y General*, 836 F.3d 336, 400 (3d Cir. 2016) (Fuentes, J., concurring in part, dissenting in part, and dissenting from judgments), *abrogated by Range*, 69 F.4th 96; *see also id.* at 400 n.160 (collecting studies). And the Supreme Court has repeatedly recognized that persons who have been "convicted of serious crimes," as a class, can "be expected to misuse" firearms. *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119 (1983); *see, e.g., Lewis v. United States*, 445 U.S. 55, 67 (1980) ("Congress' judgment that a convicted felon . . . is among the class of persons who should be disabled from dealing in or possessing firearms because of potential dangerousness is rational."); *Barrett v. United States*, 423 U.S. 212, 220

(1976) (section 922(g)'s history reflects a "concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons").

Alston ignores all this. He reduces the inquiry into the Second Amendment's original meaning to a search for a historical law just like section 922(g)(1). But the "test" that the Supreme Court set forth in *Heller* and *Bruen* "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26. That inquiry into original meaning "will often involve reasoning by analogy" to historical statutes—but it need not always do so. *Id.* at 28.

Here, no matter whether past laws exactly mirror section 922(g)(1), the available historical evidence establishes that felon-disarmament laws like section 922(g)(1) accord with the right to keep and bear arms as it was understood at the Founding. Moreover, even when the government defends a modern law by invoking historical statutes, it need only cite a "historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30.

Yet Alston demands a historical twin for section 922(g)(1). *E.g.*, AOB-42–43. In so arguing, he relies heavily on *Range*, where the Third Circuit rejected the potential analogues identified by the government because none of them imposed "the *particular*" consequence at issue "lifetime disarmament" of convicted criminals. *Range*, 69 F.4th at 105.

The Third Circuit did exactly what *Bruen* instructed courts not to do. As one dissenting judge correctly observed, to demand "a Founding-era statute that imposed the 'particular' restriction for the same length of time on the same group of people as a modern law" amounts to demanding a "'historical twin.'" *Range*, 69 F.4th at 129 (Krause, J., dissenting) (citations omitted). Alston commits the same error.

> d. *Alston may not obtain an as-applied exemption from section 922(g)(1) based on the nature of his crimes*

Alston asks this Court to find section 922(g)(1) unconstitutional as applied to him based on some of his prior burglary convictions because burglary, as a category, is not necessarily dangerous. AOB-44–46. But neither this Court's precedent nor *Bruen* allows for felon-by-felon or felony-by-felony analysis of section 922(g)(1)'s constitutionality. Instead, to uphold section 922(g)(1), this Court need only recognize that

Congress may disarm persons convicted of crimes that satisfy the common definition of a felony—crimes punishable by imprisonment for more than one year.

In interpreting other provisions of the Bill of Rights that require courts to distinguish between different types of crimes, the Supreme Court has traditionally focused on the "maximum authorized penalty"—which "provides an 'objective indication of the seriousness with which society regards the offense'"—rather than on "the particularities of an individual case." *Lewis v. United States*, 518 U.S. 322, 328 (1996) (brackets and citation omitted).

For example, the Grand Jury Clause applies only to "capital" or "infamous" crimes, U.S. Const. Amend. V, and a crime is "infamous" if it is punishable by "imprisonment for more than a year," *Branzburg v. Hayes*, 408 U.S. 665, 687 n.24 (1972) (citation omitted). The Sixth Amendment right to a jury trial similarly does not extend to petty offenses, and an offense is petty if it is punishable by a prison term of six months or less. *See Blanton v. City of N. Las Vegas*, 489 U.S. 538, 541-545 (1989).

The same approach applies here, since the Second Amendment is subject to the same "body of rules" as "the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780). When a person has been convicted of a crime punishable by more than one year of imprisonment, a court need not inquire further into the nature of the crime to determine whether disarmament is justified. Rather, the maximum authorized penalty for the offense by itself establishes that the crime is serious enough to support disarmament. *See Medina*, 913 F.3d at 160–161.

By contrast, a regime of individualized as-applied challenges to section 922(g)(1)—as Alston apparently envisions—would be unsound in principle and unworkable in practice. For one thing, that regime would distort the separation of powers. In our constitutional system, the Legislative Branch traditionally determines the consequences of criminal convictions—not only the punishment but also the collateral consequences, such as disfranchisement, disqualification from jury duty, ineligibility for public benefits, sex-offender registration, and disarmament.

The Executive Branch, in turn, traditionally grants clemency if it determines that the punishment or the collateral consequences prescribed by law do not fit a particular offender's circumstances. But if federal courts were to create a system of as-applied exemptions from section 922(g)(1), they would in effect usurp the Executive Branch's role of deciding when to make "exceptions" to the "rigor" and "severity" of the "criminal code" enacted by Congress. The Federalist No. 74, at 501 (Alexander Hamilton) (Jacob E. Cooke ed. 1961).

A regime of individualized as-applied challenges would also treat the right to possess arms differently from other rights that criminals forfeit upon conviction. As discussed above, states have long denied convicts the right to vote, the right to serve on juries, and the right to hold public office. Neither this Court nor the Supreme Court has ever suggested that a felon can challenge those disabilities because they do not fit his felony or his individual circumstances. This Court should not treat the right to possess arms any differently.

What's more, a regime of individualized as-applied challenges to section 922(g)(1) would pose serious problems of judicial administration. Alston offers no workable test for identifying the applications of section

922(g)(1) that, in his view, violates the Second Amendment. Alston seems to think that Congress may disarm only "dangerous" felons. AOB-44–46. But Congress already tried a variant of that approach—and ultimately rejected it.

Until 1992, felons could obtain relief from section 922(g)(1) by proving to ATF that they would "not be likely to act in a manner dangerous to public safety." 18 U.S.C. § 925(c). Congress found that program unworkable and abandoned it. *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007); *see* S. Rep. No. 353, 102d Cong., 2d Sess. 19, 20 (1992); H.R. Rep. No. 183, 104th Cong., 1st Sess. 15 (1996).

The regime that Alston envisions would, if anything, be even less feasible than the system of administrative relief that Congress tried and abandoned. Unlike an administrative agency, "courts possess neither the resources to conduct the requisite investigations nor the expertise to predict accurately which felons may carry guns without threatening the public's safety." *Pontarelli v. U.S. Dep't of the Treasury*, 285 F.3d 216, 231 (3d Cir. 2002) (en banc) (citations omitted). And no individualized determination is needed, since felons "are categorically

different from the individuals who have a fundamental right to bear arms." *Vongxay*, 594 F.3d at 1115.

Finally, Alston complains that felons are "permanently" disarmed (AOB-41, 45) for their "lifetime" (AOB-39, 40, 43, 46). But in fact, mechanisms exist for felons to seek restoration of their Second Amendment rights. For purposes of section 922(g)(1), the term "crime punishable by imprisonment for a term exceeding one year" excludes (among other things) "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored." 18 U.S.C. § 921(a)(20). "To determine whether a person's civil rights have been restored," this Court looks to "applicable state laws on the possession of firearms." *United States v. Jarnig*, 860 F. App'x 471, 472–73 (9th Cir. 2021) (citing *United States v. Herron*, 45 F.3d 340, 342 (9th Cir. 1995)).

Several states in our circuit—including Alston's state—have such restoration laws in place. *E.g.*, RCW §§ 9.96.010–9.96.080; *United States v. Palmer*, 183 F.3d 1014, 1017 (9th Cir. 1999) (noting Washington State's restoration of defendant's rights); *United States v. Loucks*, 149 F.3d 1048, 1049 (9th Cir. 1998) (describing how a

Washington defendant may "petition the governor to restore his civil rights").[13]

*  *  *

For all these reasons, Alston's claim fails under both steps of the *Bruen* test. On step one, section 922(g)(1) imposes no "burden [on] a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. A felony conviction "necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment." *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017); *see Vongxay*, 594 F.3d at 1115 ("felons are categorically different from the individuals who have a fundamental right to bear arms"). Plus, the burden imposed on the felon's rights is akin to historical laws disarming the untrustworthy. And the burden is less severe than many historical felony-punishment laws, which often included the death penalty and forfeiture of property.

Under *Bruen*'s step two, the modern and historical laws are "comparably justified." *Bruen*, 597 U.S. at 29. The historical laws

---

[13] *See also, e.g.*, *United States v. Sullivan*, No. 22-30034, 2023 WL 2064565, at *1 (9th Cir. Feb. 17, 2023) (Montana law); *Jarnig*, 860 F. App'x at 473 (Alaska law).

sought to punish felons, deter reoffending, and protect society from the untrustworthy. Section 922(g)(1) serves a more limited but equally justified purpose: to protect society from gun violence committed by felons, who have shown disregard for society's laws and who are more likely to reoffend, potentially in dangerous ways. The lack of an identical historical statute does not suggest that the Founding generation would have viewed section 922(g)(1) as unlawful. Founding-era legislatures cannot be presumed to have legislated to the full limits of their constitutional authority. And there is good reason to think they might not have done so in this field, as firearms were more expensive, less dangerous, and rarer in the Founding era than they are today.

Section 922(g)(1), in short, fits comfortably into the nation's history and tradition of gun regulation.

### E. Alston cannot satisfy plain error's requirements

Even if Alston's historical arguments had merit, he cannot show plain error. Meeting all four of plain error's requirements "is difficult, 'as it should be.'" *Puckett v. United States*, 556 U.S. 129, 135 (2009) (citation omitted). Alston cannot meet them and does not try.

### 1. There was no error

For the reasons discussed above, Alston has not shown that section 922(g)(1) violates the Second Amendment as applied to him.

### 2. The alleged error was not plain

To be plain, an error must be clear or obvious under current law, not subject to reasonable dispute. *Puckett*, 556 U.S. at 135; *United States v. Christensen*, 828 F.3d 763, 789–90 (9th Cir. 2015). An error cannot be plain when no controlling authority is on point and the most closely analogous precedent leads to conflicting results. *United States v. Gonzalez Becerra*, 784 F.3d 514, 518 (9th Cir. 2015).

Based on *Bruen* itself and caselaw from this Court and others, Alston cannot show that section 922(g)(1), as applied to him, is clearly or obviously unconstitutional under current law.

This Court's pre-*Bruen* precedent, including *Vongxay*, prevents Alston from making that showing. The same is true of this Court's post-*Bruen* precedent. Recently, this Court applied *Bruen* to reject a Second Amendment challenge to a Sentencing Guidelines provision that enhances a defendant's sentence if he possesses a dangerous weapon at the time of a felony drug offense. *United States v. Alaniz*, 69 F.4th 1124

65

(9th Cir. 2023). This Court explained that while the challenged firearm restriction was part of the Guidelines—a modern invention with no exact historical twin—it fit within a long tradition of regulations designed to disarm dangerous people. *Id.* at 1129–30. Citing *Bruen*, this Court held that the Guidelines provision was a kind of gun regulation "that the Founders would have tolerated." *Id.* at 1130. So too here.

Sister circuits' recent decisions likewise prevent Alston from showing clear or obvious error. In a pair of recent post-*Bruen* decisions, the Eighth Circuit held that section 922(g)(1) satisfies the Second Amendment. *Jackson*, 69 F.4th at 501–06; *United States v. Cunningham*, 70 F.4th 502, 506 (8th Cir. 2023). The Eighth Circuit rejected as-applied challenges to section 922(g)(1) by defendants with felony convictions for drug dealing, *Jackson*, 69 F.4th at 504–06, and for driving under the influence, *Cunningham*, 70 F.4th at 504. In both cases, the Eighth Circuit denied petitions for rehearing.[14]

The Tenth Circuit, too, recently held that section 922(g)(1) satisfies the Second Amendment; that *Bruen* did not abrogate the

---

[14] *United States v. Jackson*, 85 F.4th 468 (8th Cir. 2023); *United States v. Cunningham*, No. 22-1080, 2023 WL 5606171 (8th Cir. Aug. 30, 2023).

court's earlier precedent; and that the court had "no basis to draw constitutional distinctions based on the type of felony involved." *Vincent v. Garland*, 80 F.4th 1197, 1197–1202 (10th Cir. 2023). The Tenth Circuit thus upheld section 922(g)(1) as applied to that defendant, who had a prior conviction for bank fraud. *Id.* at 1199.

At least two other circuits—the Fifth and the Seventh—have rejected claims like Alston's on plain-error review, finding that any error could not be plain because section 922(g)(1) is not obviously unconstitutional after *Bruen*. *United States v. Miles*, 86 F.4th 734 (7th Cir. 2023); *United States v. Racliff*, No. 22-10409, 2023 WL 5972049, *1 (5th Cir. Sept. 14, 2023) (per curiam); *United States v. Roy*, No. 22-10677, 2023 WL 3073266, *1 (5th Cir. Apr. 25, 2023) (per curiam); *United States v. Avila*, No. 22-50088, 2022 WL 17832287, at *2 (5th Cir. Dec. 21, 2022) (per curiam).

Only the Third Circuit has disagreed, in a "narrow" opinion involving an as-applied challenge brought by an appellant who had one 15-year-old state conviction for "making a false statement to obtain food stamps." *Range*, 69 F.4th at 98, 106. Not only is *Range* distinguishable

and wrongly decided, [15] but the Third Circuit was not bound by *Vongxay*—as this Court is.

At the very least, this Court's recent decision in *Alaniz,* its pre-*Bruen* precedents, and other courts' varied interpretations of *Bruen* together show that section 922(g)(1), as applied to Alston, does not violate the Constitution on plain-error review.

### 3. Alston's substantial rights are unaffected

On plain error's third prong, Alston bears the burden of laying the record necessary to show prejudice. *United States v. Gonzalez-Aguilar,* 718 F.3d 1185, 1189 (9th Cir. 2013). And by asserting an as-applied challenge to "carve" himself out of section 922(g)(1), *Hatfield*, 925 F.3d at 953, Alston also must show that the statute is unconstitutional as applied to him.

Alston cannot make these showings. Even the authorities he cites recognize that section 922(g)(1) may be valid in some applications. Then-Judge Barrett concluded, for example, that "the state can take the

---

[15] In October 2023, the United States petitioned the Supreme Court for certiorari. *Att'y General v. Range*, No. 23-374. The government asked the Supreme Court to hold the petition pending resolution of *Rahimi*, No. 22-915.

right to bear arms away from a category of people that it deems dangerous" but cannot take that right away from nonviolent felons unless their "history or characteristics make [them] likely to misuse firearms." *Kanter*, 919 F.3d at 464, 468 (Barrett, J., dissenting). Felons as a class arguably meet that test, as discussed. But even if they do not, Alston does.

Alston has a long and violent criminal history. It includes not just the burglary convictions he mentions (AOB-45) but domestic violence and other serious crimes. PSR ¶¶ 38–54, 58–59, 60–65. That history more than suffices to show a serious risk that he will misuse guns.

History aside, Alston carried guns while committing other felonies *in this case*. He carried his revolver while stealing more than $1,600 of goods from a store—a "felony theft." SER-22, 50; PSR ¶ 9; 4-ER-579–83. And he possessed his pistol in furtherance of two felony drug-trafficking crimes, in violation of 18 U.S.C. § 924(c).[16] Guns and drug trafficking together create "a grave possibility of violence and death." *Smith v. United States*, 508 U.S. 223, 240 (1993); *cf. Alaniz*, 69 F. 4th at 1129–30

---

[16] *See* 4-ER-568; SER-83. Alston asserts no Second Amendment challenge to his 18 U.S.C. § 924(c) conviction in Count 3—only to his 18 U.S.C. § 922(g)(1) convictions in Counts 4 and 5.

(holding that enhancing sentences for carrying guns during drug crimes "clearly comports with . . . history and tradition" and noting "the increased risk of violence created by mere possession of a firearm during the commission of certain crimes").

Alston thus did not possess his guns for lawful "self- and home-defense," "protection from wildlife," or "obtaining food." AOB-40–41. He possessed them while committing serious crimes. His history and characteristics, coupled with his actions in this case, leave no doubt that he is likely to misuse firearms. So even if the Court believes that section 922(g)(1) may not be constitutional in all its applications, and even if the statute allowed for felon-by-felon analysis, the law is still constitutional as applied to Alston.

In arguing otherwise (AOB-45), Alston cites some of his prior burglary convictions, argues that burglary in the abstract is "not necessarily a badge of dangerousness," and notes that "Washington burglary is not a crime of violence for modern sentencing guidelines or statutory enhancement purposes." But no authority supports Alston's effort to inject crime-of-violence analysis into the Second Amendment. And Alston sanitizes his history beyond recognition. Any suggestion

that he is "law-abiding" or "responsible" (AOB-44) blinks reality. The district court has already found, both before trial (SER-221–23) and at sentencing (SER-22, 49–50), that Alston is dangerous.

> **4.** *The alleged error does not seriously affect the fairness, integrity, or public reputation of judicial proceedings*

If a defendant satisfies plain error's first three prongs, this Court has discretion to remedy an error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Puckett*, 556 U.S. at 135. But that power must be used sparingly and solely to prevent a miscarriage of justice. *Singh*, 979 F.3d at 728.

No miscarriage of justice would result from leaving Alston's guilty pleas intact. He is a felon with a history of violence who possessed guns while committing new felonies. If section 922(g)(1) applies to anyone, it applies to him.

## CONCLUSION

The Court should affirm Alston's five convictions.

December 8, 2023

Respectfully submitted,

TESSA M. GORMAN
Acting United States Attorney

*s/ Jonas Lerman*
JONAS LERMAN
Assistant United States Attorney
Western District of Washington

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-30035

I am the attorney or self-represented party.

**This brief contains** | 13,983 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( • ) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Jonas Lerman | **Date** | December 8, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**     *Rev. 12/01/22*

## STATEMENT OF RELATED CASES

The Supreme Court heard oral argument on November 7, 2023, in *United States v. Rahimi*, No. 23-915. At issue is the constitutionality of 18 U.S.C. § 922(g)(8) after *Bruen*. A decision is forthcoming.

Several appeals pending in this Court involve *Bruen*-based Second Amendment challenges to 18 U.S.C. § 922(g)(1), including:

- *United States v. Duarte*, No. 22-50048. Argued on December 4, 2023 (Bea, M. Smith, VanDyke, JJ.).

- *United States v. Martinez*, No. 23-1125. Stayed pending *Duarte*.

- *United States v. Howard*, No. 22-10211. Without objection, the government has moved for a stay pending *Duarte* and *Rahimi*.

- *United States v. Butts*, No. 23-313. Answering brief filed November 20, 2023.

- *United States v. Rojo*, No. 23-598. Answering brief filed November 18, 2023.

- *United States v. Registe*, No. 20-30042. Stayed pending *Rojo*.

- *United States v. Gonzalo Ramos*, No. 22-50177 (Bade, Lee, VanDyke, JJ.). The Court dismissed the appeal as barred by the defendant's plea agreement. His reconsideration motion is due December 12, 2023.

Finally, in *United States v. Garcia*, Nos. 22-50314 & 22-50316 (Wardlaw, Clifton, Sanchez, JJ.), the defendants asserted a Second Amendment challenge to a pretrial bond condition prohibiting firearm

possession. The Court heard oral argument on January 26, 2023. In an order issued the same day, the Court affirmed the district court's denials of the defendants' motions to modify their conditions of release, stating that "[a]n opinion explaining this disposition will follow." Dkt. 21. That opinion has not yet issued.